No. 62,687

STATE OF KANSAS, *Appellee,* v. TIMOTHY C. GONZALES, *Appellant.*

(783 P.2d 1239)

Opinion filed December 8, 1989.

*Shannon S. Crane,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Ricklin R. Pierce,* county attorney, argued the cause, and *Larry C. Hoffman,* assistant county attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

PAUL E. MILLER, District Judge, assigned: Timothy C. Gonzales, defendant, appeals his conviction of one count of felony murder (K.S.A. 21-3401) and one count of attempted rape (K.S.A. 21-3301; K.S.A. 21-3502). Since sufficiency of the evidence is an issue raised by defendant, the facts will be set forth in some detail.

The body of the victim, L.B.W., was found by Bryce Hill, the foreman of Circle-N-Cattle, on the morning of August 17, 1986,

in a cornfield called Cowgill 18 south of Garden City. The corn-field was located about a mile south of the Circle Feeders shop on a private road called either Circle Feeders Road or Cowgill Road. When Hill turned from Cowgill Road onto the access road into Cowgill 18, he noticed several red spots on the dirt access road and got out of his truck to investigate. He followed "drag marks" from one pool of blood to a second pool. Hill testified that at first he could not tell what the drag marks were, but as he walked further up the road, he saw spots where it appeared that human hands had tried to grip the dirt. The drag marks led off the road and into the corn, where Hill noticed a pair of underwear hanging on a cornstalk and that the stalk was knocked down. It was then that he discovered the victim's body and went for help.

The victim was last seen alive at the Finney County free fair. Doug Robinson, who had been dating the victim, testified that she was at his house from approximately 9 p.m. until 11 p.m on the night of August 16, 1986. When she left, she told him that she might go to the carnival for awhile.

Adam Flores testified that he has known the defendant, Gon-zales, for seven years. He testified that he also knew of the victim from school, although he was not personally acquainted with her.

Flores testified that on the evening of August 16, 1986, he was walking to the fair and defendant stopped and offered him a ride. Flores declined because he was almost to the fair. He saw the defendant drive into the parking lot, but he did not see him park the car. Flores saw defendant again inside the fair, and they walked around together and "checked out" women. The two watched a concert for awhile and then walked around again. Flores said that they then saw the victim and that defendant pointed her out to him. Flores told defendant that he should recognize her from school. Flores testified that defendant told Flores that "he was going to try to get it" and that the defendant called out to her. Flores testified that defendant and the victim walked together to the parking lot and that he followed about five feet behind.

When the two reached the parking lot, they stopped by a car and talked. Flores could not hear their conversation or tell which car they stood by. Flores then left and walked home because,

as he testified, "Three's a crowd." He testified that it must have been shortly before midnight when he last saw the defendant and the victim together because the fair was beginning to shut down and people were leaving. Flores also testified that he had been riding around with defendant in his car a couple of weeks before the murder and that there was a brown lock-blade knife on the console of the car. Flores said that defendant had the same knife in a leather pouch attached to his belt on the night they walked around the fair.

Ernest Campos, the defendant's brother-in-law, testified that he was the owner of a 1972 Mercury Montego. He testified that on August 16, 1986, defendant had possession of the car because he was purchasing the car from him. At the time of the murder, the car still had Campos' license plates on it. Adam Flores identified the car as the same one that he saw defendant driving on the night of August 16. Frank Romero, who was dating defendant's sister on August 16 and is now married to her, testified that he brought her home at approximately 9 p.m. on August 16, 1986, and that defendant's car was not there. Both the defendant and his sister were residing at their parents' house at the time.

Defendant did not testify at the trial, but Bruce Mellor, a K.B.I. agent, testified as to a statement he took from defendant in December 1986. Defendant admitted having gone to the fair on the night of August 16, but he said he walked there because his car would not start.

Abundio Munoz, an officer with the Finney County Sheriff's Department, was on the night shift patrol on August 16, 1986. At 12:24 a.m. on August 17, he investigated a bonfire in an area near where the victim's body was found. After that stop, he continued west on Sagebrush Road, which leads into Cowgill Road. When he got to the intersection of Sagebrush and Cowgill Road, he turned his vehicle around. As he was making a u-turn, he noticed a vehicle coming from the south on Cowgill Road and he waited for it. Munoz testified that his attention was drawn by the car because it was unusual to see traffic in that area at that time of night. Munoz followed the car and noticed that it was a green, 70s-vintage Mercury or Ford. He called in the registration and was told that the car was registered to Ernest Campos. Munoz testified that he is personally acquainted with Campos and that

Campos was not driving. Munoz described the driver as a Hispanic male, with no shirt, who appeared to be either wet or sweaty. Munoz followed the car east on Sagebrush to Highway 83, at which time (12:34 a.m.) he received a call and turned off. The times about which Munoz testified were confirmed by both his activity log and dispatcher's records from the Finney County Sheriff's office.

When found, the victim's body was clad in an oxford-type shirt, all but two of the buttons of which had been ripped off. Her bra was blood-soaked and appeared to have been slashed. She had been stabbed numerous times and her throat had been cut. The whole upper portion of the victim's body was blood-soaked, but was relatively clean from the waist down. Her blood-soaked blue jeans were found in the general area, as were her baseball cap, underwear, and shoes.

An autopsy on the victim's body was performed by Dr. David DeJong, a Wichita forensic pathologist. DeJong testified that the victim died at approximately midnight August 16 due to a combination of asphyxiation and blood loss from multiple slash wounds to her neck area. The doctor testified that these wounds were made by a single-sided blade with a minimum length of two inches. There were also two wounds on the victim's right hand similar in nature to those resulting from a person trying to defend against an attack. Semen was found on the victim's inner front left thigh.

Vivian VanVleet, an investigator with the Finney County Sheriff's Department, testified that there were three pools of blood found on the access road. VanVleet described drag marks from the first pool of blood to the second pool and what appeared to be the marks of the victim's fingers trying to grab the dirt.

At the second pool of blood, the dirt was disturbed as if there had been some sort of struggle. At the third pool of blood, there were imprints which, taken in conjunction with the condition of the body, indicated that the body had been laid on its back with the head facing north and the feet south. VanVleet testified that the dirt there was soft and sandy and that imprints were left indicating that the victim's legs were spread and someone had knelt between them. There were also hand prints in the ground on the east side of the body.

Defendant's car was searched, and samples were taken from it. Blood, saliva, and hair samples were taken from defendant. The tires from defendant's car were sent to the F.B.I. lab in Washington, D.C. Robert Hallett, a special agent with expertise in tire tread examinations, testified that the tires from the defendant's car matched tire tracks from the crime scene in size and design and that at least one of the tires corresponded as far as general wear with a track found at the scene.

A forensic serologist testified that the defendant could be the donor of the semen found on the victim's leg. She also testified that the defendant was a possible donor of blood found in fingernail scrapings taken from the body of the victim.

Two fibers found on the victim's blue jeans matched fibers from the seat of defendant's car both in color and microscopic characteristics. Luminol was sprayed on the interior of defendant's car to detect traces of blood not visible to the human eye. Although the Luminol did indicate traces of blood, no conclusion could be made as to the source of the blood.

In November of 1986, the police obtained a search warrant and searched defendant's home. Under his bed officers found a box containing sex magazines and a *Garden City Telegram* newspaper dated August 18, 1986. The front page of the newspaper contained an article about the murder of the victim. During an interview with Agent Mellor, defendant said that his sister used newspaper to wrap up her baby's diapers; however, there were no diapers or other baby supplies found in defendant's room.

Jack Spears was in custody with the defendant in the Finney County jail after defendant's arrest. During the course of the investigation, Agent Mellor discovered that Spears had written a letter to an inmate at Lansing State Penitentiary. The letter was admitted into evidence with no objection. The letter indicated that the defendant admitted to Spears that he had killed the victim. The State called Spears as a witness at trial, but Spears refused to answer any questions on the advice of counsel. At the time of defendant's trial, a prosecution was pending against Spears in another, unrelated murder case.

The defense presented the testimony of Donna Rupp, a resident of the northernmost trailer court on Cowgill Road. She testified that on the night of August 16, 1986, she arrived home

between 10:00 and 10:30 p.m. Rupp testified that it was her custom to stay up until her 18-year-old daughter returned home. She testified that on that evening she sat and watched TV in her bedroom and that she could see Cowgill Road north to where it intersects with Sagebrush through the window above her TV set. She said that she saw every vehicle that passed by on Cowgill Road between 10:30 p.m. and 3:00 a.m. that night. She said she recognized all the cars that passed as belonging to neighbors that lived in other trailers, except one. She testified that a car came from the north at about 1:45 a.m. and it returned to the north at 2:05 a.m. When shown a picture of defendant's car, she said it was definitely not the car she saw that night because the car she saw had "fins."

Jesse Dyke, another resident of one of the trailer parks, testified that he returned home at approximately midnight on the night of the murder. He said that there was a car in front of him as he proceeded south on Cowgill Road, but that the car continued south when he turned into his driveway. He testified that the car stopped approximately a quarter of a mile further. down the road and that he was going to go check it out when it proceeded on. He said that all he could see were the taillights and at first he thought it was one of his neighbors who drove a Ford. When shown a photo of the taillights of defendant's car, Dyke said that they were similar to the ones he had seen that night.

Defendant was charged with one count of felony murder and one count of attempted rape. The jury returned a verdict of guilty on both charges. Defendant was sentenced to life imprisonment on the felony-murder charge and, pursuant to the Habitual Criminal Act (K.S.A. 21-4504), ten to forty years on the attempted rape charge. The sentences were ordered to run consecutively. A motion to modify sentence was denied, and defendant timely filed a notice of appeal.

The first issue raised by the defendant is whether there was sufficient evidence presented to prove that the murder was committed while in the commission of an attempted rape. Rape is defined at K.S.A. 21-3502 as "sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances: (a) When the victim is overcome by force

or fear; (b) when the victim is unconscious or physically powerless."

Sexual intercourse is defined as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 21-3501(1). An attempt is defined as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301.

Where the sufficiency of the evidence to support a criminal conviction is challenged, the standard of review is whether the evidence, viewed in the light most favorable to the State, convinces the court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Walker*, 244 Kan. 275, 280, 768 P.2d 290 (1989).

Defendant argues that the contents of Jack Spears' letter, wherein Spears writes that defendant admitted killing the victim because of her refusal to indulge in anal sex, indicated that defendant intended to commit aggravated criminal sodomy, not rape, and, thus, the State mistakenly charged him with attempted rape. That there may be evidence in the record of defendant's attempt to sodomize the victim does not, however, preclude a finding that he also attempted to rape her.

Adam Flores testified that he and defendant were walking around the fair with the hopes that they might "get lucky." Defendant indicated to Flores that he wanted to try to "get it" from the victim. Semen was found on the victim's *front* left thigh. Her bra had been cut open in front and her blood had been smeared over her breasts. Her panties had either been ripped or cut off. The back of her legs and her buttocks were covered with caked dirt. The majority of her wounds were sustained in a frontal attack. Investigator VanVleet testified as to the condition of the ground at the third pool of blood as follows:

"There are also indentations in the ground which is a soft—soft sand surface. And to the pivot road and it appears as though those indentations—the body of [the victim]—where an individual could possibly have spread her legs and knelt down between the body. On the east side of where the body

had laid there are hand imprints in the ground, which would have been used as some sort of leverage to get up or down."

A photograph of the above-described indentations is included in the record. While the photograph is not conclusive, it does tend to corroborate VanVleet's testimony.

"A charge of attempted rape may be established without evidence of attempted penetration." *State v. Hanks*, 236 Kan. 524, 529, 694 P.2d 407 (1985). We conclude the evidence was sufficient to convince the jury that the defendant attempted to rape the victim.

Defendant's next claim of error is that the trial court erred in excluding testimony by two friends of the victim that she had a habit of "forming social acquaintances with men on a spontaneous basis." Defendant contends that the exclusion of this testimony precluded him from presenting his theory of defense: that the victim met another man after she was seen with defendant on that evening. "Ordinarily, a court does not err in refusing to admit evidence tending to connect a third person with an offense except where the prosecution relies upon circumstantial evidence for conviction." *State v. Henderson*, 205 Kan. 231, 239-40, 468 P.2d 136 (1970). In the case at bar, the State's case was mostly circumstantial.

The court gave three reasons for excluding the testimony: (1) The testimony implied that the victim was at fault in her death, (2) the testimony raises specific instances of misconduct by the victim, and (3) the testimony puts the victim's character at issue.

The State argues that the proposed testimony was an attempt to bypass the rape shield law. The Kansas Rape Shield Law, found at K.S.A. 21-3525(2), provides that evidence of a victim's previous sexual conduct may only be admitted if the defendant makes a motion prior to trial, a hearing is held on the motion, and the court determines that the evidence is relevant.

There is no indication in the record, however, that the defense intended to present testimony as to the victim's "previous sexual conduct." According to defense counsel, Patricia Condo would testify that, on the night preceding the victim's murder, Condo saw the victim at the fair. The victim told Condo that she did not like the man she was with and walked away with Condo, leaving the man behind. Condo would further testify that later

in the evening the victim approached another man and began conversing with him. Defense counsel said that Tammy Myers would testify that she had known the victim since childhood and that the victim had a "propensity to establish her social acquaintances with males on a spontaneous basis."

Since the record does not show what the actual testimony would be, it is difficult to determine if the rape shield statute would apply. If forming "social acquaintances with men on a spontaneous basis" meant that the victim had a habit of having intercourse with men she had just met, the rape shield statute would probably be applicable. If, however, the witnesses were merely to testify that the victim had a habit of introducing herself and conversing with strange men, then the rape shield statute would probably not be applicable. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper." *State v. Bright,* 229 Kan. 185, Syl. ¶ 6, 623 P.2d 917 (1981).

K.S.A. 60-405 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

We find the defendant "made known" the substance of the proffered evidence in a manner approved by the trial judge.

"The exclusion of evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial." *State v. Bradley,* 223 Kan. 710, Syl. ¶ 2, 576 P.2d 647 (1978). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). Defendant argues that it was essential to his defense to prove that, even if he had been seen with the victim on the night of her murder, it was entirely possible that she was with someone else after she had been with him. Although defendant did not testify at trial, his defense appeared to be one of general denial. He indicated to Agent Mellor that he did not know the

victim. Although he admitted being at the fair on the night of the murder, he said he walked there and that he left the fairgrounds at approximately 11:30 p.m.

The testimony excluded did not constitute an *integral* part of Gonzales' defense. Only two items of evidence support a theory that the victim was with someone else after she was seen with defendant. First, Adam Flores did not actually see the victim leave the fairgrounds with defendant. Second, Donna Rupp testified that the only unfamiliar car which passed by her house on the night of the murder was not the defendant's car. Rupp's testimony, however, was contradicted by the testimony of Officer Munoz and Jesse Dyke. Flores last saw the victim with Gonzales shortly before midnight. Munoz placed defendant's car in the remote area where the body was found at approximately 12:30 a.m. Dr. DeJong testified that the time of death was closer to midnight than to dawn. In cross-examining Flores, the defense stressed the fact that Flores did not actually see where defendant's car was parked or whether the victim actually left the fairgrounds with defendant. The jury could have concluded that the victim met someone else after she was seen with defendant based on this testimony, but it did not reach that conclusion. It is doubtful that the testimony as to the victim's habit of meeting men would have changed the jury's verdict.

The United States Supreme Court cases cited by defendant are distinguishable in that they deal with evidence which either directly challenged evidence presented by the prosecution or evidence which directly implicated another specific individual as the perpetrator of the crime. In the case at bar, the defendant sought to have testimony admitted that indirectly supported a remote possibility that the victim came into contact with some other unidentified person in the short interval of time between her contact with the defendant and her murder.

K.S.A. 60-449 states: "Evidence of habit or custom is relevant to an issue of behavior on a specified occasion, but is admissible on that issue only as tending to prove that the behavior on such occasion conformed to the habit or custom." Pursuant to K.S.A. 60-450, habit or custom may be proved by opinion testimony or it can be proved by evidence of specific instances of behavior where there are a sufficient number of instances to warrant a

finding of such habit. The only specific instance that the defense sought to admit into evidence related to the victim's actions on the night before her murder, as related by Patricia Condo. According to Vernon's Kansas C. Civ. Proc. § 60-449, comment (1965), "Habit designates an essentially mechanical course of action." A propensity to introduce oneself and converse with strangers is better described as a character trait than a habit. The victim's character was not at issue in this case.

Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The material fact sought to be proven by the defense was that the victim met someone else after she was seen conversing with the defendant on the night of the murder. Even if the defense had convinced the jury that the victim had a tendency to approach strange men, that fact does not prove that she approached someone after she met the defendant.

"Under K.S.A. 60-445 a trial judge may exclude evidence when the chance of prejudicing the jury outweighs the probative value of the evidence. The judge is given wide discretion under that statute." *Powers v. Kansas Power & Light Co.*, 234 Kan. 89, 101, 671 P.2d 491 (1983). In the case at bar, the probative value of the testimony of Myers and Condo was slim and there was a strong probability that the testimony would create an inference of fault on the part of the victim. The trial court did not err in excluding the testimony.

Defendant next claims error in the trial court's refusal to require Jack Spears to testify. At the time of trial, Spears was being held in the Finney County jail on an unrelated murder charge. His case was set for trial in less than a month. When Spears was called to the stand, his attorney appeared and objected to his compelled testimony. Spears' attorney contended that it was prejudicial to his client to be compelled to testify at such a time. The attorney also referred to a statement taken from Spears without notice to counsel. The statement regarded information that Spears obtained from defendant while they were cellmates; however, it apparently also contained some remarks which incriminated Spears in the case against him. The State responded:

"I am willing to simply present Mr. Spears for the purposes of cross-examination, just to show good faith to defense counsel. I don't know that

I even need to do that at this point, because the letter that he authored has been admitted as evidence. But I want to make him available to counsel to cross-examine concerning that letter, and for no other purpose. I do not wish to get into testimony concerning his statement."

Spears' counsel also contended that the State had not followed the proper procedure to compel a prisoner to testify pursuant to K.S.A. 22-3416. The court rejected that argument, informed Spears of his Fifth Amendment right not to testify as to anything that might incriminate him, and ordered Spears to take the stand. Spears refused to answer any questions, and the court excused him. Counsel for defendant made no objection to Spears' refusal to testify and did not request that the court impose any sanctions on Spears to compel him to testify. As mentioned before, Spears' letter had already been admitted into evidence without objection.

"The defendant cannot raise points on appeal which were not presented to the trial court." *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986). We find no merit in this contention.

Defendant finally contends that his convictions for both felony murder and the underlying offense of attempted rape violate the double jeopardy clause of the United States and the Kansas Constitutions. This issue was raised in *State v. Dunn*, 243 Kan. 414, 432, 758 P.2d 718 (1988), in which this court stated:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute provides proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap."

In *Dunn*, the defendant was convicted of two counts of felony murder, two counts of aggravated kidnapping, one count of aggravated robbery, one count of aggravated battery on a law enforcement officer, and one count of aggravated battery. On appeal, she argued that the aggravated robbery and kidnapping charges were lesser included offenses of felony murder and that to convict her of the murders in addition to the underlying felonies would violate the constitutional prohibition against double jeopardy.

The court discussed the merger doctrine, which does not apply where the underlying felony is a separate and distinct offense from the homicide. The court found that one of the elements of aggravated robbery is to deprive a person of property, which is not an element of homicide. By the same token, the crime of aggravated kidnapping has several elements which are not required to prove homicide.

Gonzales contends that the *Dunn* opinion was wrong. He argues that, because proof of the underlying felony is an essential element of the crime of felony-murder, any underlying felony is a lesser included offense of felony murder. He cites *Whalen v. United States*, 445 U.S. 684, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980).

In *Whalen*, the defendant was convicted in the District of Columbia of rape and felony murder, the rape being the underlying felony to support the felony-murder conviction. Whalen was given consecutive sentences for the two charges and he argued that the imposition of consecutive sentences was contrary to federal statutory and constitutional law. The Court held that the double jeopardy clause precludes federal courts from imposing consecutive sentences unless authorized by Congress. 445 U.S. at 689.

The Court, therefore, had to interpret whether consecutive sentences were authorized by Congress under the District of Columbia Code in that particular fact situation. The Court cited the rule of *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932):

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

At the time of the *Whalen* opinion, D.C. Code Ann. § 23-112 (1973) provided that sentences imposed were to run consecutively "whether or not the offense . . . *arises out of the same transaction and requires proof of a fact which the other does not.*" The Court held that this statute was a codification of the *Blockburger* rule. The Court said, "A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of

rape." 445 U.S. at 693-94. Therefore, the Court held that the trial court erred in giving Whalen consecutive sentences.

In *Missouri v. Hunter*, 459 U.S. 359, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983), the defendant was convicted under Missouri law of robbery in the first degree and armed criminal action. The charges arose out of the same incident: the robbery of a supermarket. The Court stated:

"The Double Jeopardy Clause is cast explicitly in terms of being 'twice put in jeopardy.' We have consistently interpreted it " 'to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' " [Citations omitted.] Because respondent has been subjected to only one trial, it is not contended that his right to be free from multiple trials for the same offense has been violated. Rather, the Missouri court vacated respondent's conviction for armed criminal action because of the statements of this Court that the Double Jeopardy Clause also 'protects against multiple punishments for the same offense.' [Citation omitted.] Particularly in light of recent precedents of this Court, it is clear that the Missouri Supreme Court has misperceived the nature of the Double Jeopardy Clause's protection against multiple punishments. With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." 459 U.S. at 365-66.

The Court further stated:

"Our analysis and reasoning in *Whalen* and *Albernaz* lead inescapably to the conclusion that simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in *Whalen* is not a constitutional rule requiring courts to negate clearly expressed legislative intent." 459 U.S. at 368.

The resolution of this issue, therefore, depends on whether the Kansas Legislature intended to allow conviction and punishment for both felony murder and the underlying felony.

The issue of legislative intent was not addressed in *Dunn*. A perusal of Kansas cases indicates that it is common practice for a defendant to be charged with felony murder and the underlying felony. See, *e.g.*, *State v. Dunn*, 243 Kan. 414; *State v. Longobardi*, 243 Kan. 404, 756 P.2d 1098 (1988). We have ruled that a defendant need not be charged and convicted of the underlying felony in order to be convicted of felony murder. *State v. Wise*, 237 Kan. 117, 122, 697 P.2d 1295 (1985).

K.S.A. 21-3401 was enacted in 1969, when the legislature en-
acted the new Kansas Criminal Code. The statute made no sub-
stantive change in the law. *Proposed Kansas Criminal Code,*
Kansas Jud. Council Bull., Comment, April 1968, at 46.

A major amendment was made to the statute in the past year.
L. 1989, ch. 87, § 1. This amendment was in response to this
court's decision in *State v. Prouse,* 244 Kan. 292, 767 P.2d 1308
(1989). In *Prouse,* the defendant had been charged with felony
murder, with child abuse as the underlying felony. The defendant
had been convicted of both child abuse and felony murder. This
court reversed the felony-murder conviction, finding that felony
murder cannot be based on child abuse under the merger doc-
trine. The court stated:

"For further illustration, consider the situation where a robber shoots the
victim during the commission of an aggravated robbery. If the victim lives,
the robber could be convicted of the two separate felonies he or she com-
mitted—aggravated battery and aggravated robbery. If the victim dies as a
result of the injuries so received, the robber may still be convicted of two
felonies—felony murder and aggravated robbery. However, if the only fe-
lonious conduct involved is the cause of the victim's death, then the doctrine
of merger prevents the prosecution from splitting the act into a felony
murder and a collateral felony charge. Therefore, an aggravated battery
cannot serve as the collateral felony for felony murder." 244 Kan. at 297.

The legislature amended K.S.A. 21-3401 to specifically include
child abuse as a collateral felony for felony murder. The legislature
remained silent as to the issue of charging the defendant with
both the underlying felony and felony murder; therefore, one can
surmise that the legislature approved of this practice. The ex-
ample given in *Prouse* reflects the absurdity of prohibiting such
a practice. If such were the case in the example given, if the
victim lived, the State could prosecute the defendant on two
charges, but if the victim died, the State could only prosecute
on one charge.

The general rule is that penal statutes are to be strictly con-
strued against the State. *State v. Magness,* 240 Kan. 719, 721,
732 P.2d 747 (1987). But, "[t]he rule of strict construction con-
cerning penal statutes is subordinate to the rule that judicial
interpretation must be reasonable and sensible to effectuate leg-
islative design and the true intent of the legislature." *State v.
Carmichael,* 240 Kan. 149, 159, 727 P.2d 918 (1986).

Defendant cites K.S.A. 21-3107, which states in part:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

. . . .

"(d) a crime necessarily proved if the crime charged were proved."

Defendant argues that this statute, *State v. Fike,* 243 Kan. 365, 757 P.2d 724 (1988), and *State v. Adams,* 242 Kan. 20, 744 P.2d 833 (1987), preclude his conviction of both charges because the alleged elements of attempted rape must be proved in order to prove felony murder. He specifically relies upon subsection (2)(d) above quoted and the second prong of the *Fike* test, which is whether the specific factual allegations and evidence required to prove the crime charged also necessarily prove the lesser crime. 243 Kan. at 368.

The flaw in defendant's argument is that he fails to recognize the distinction between the "lesser included offense" doctrine and the "felony-murder" doctrine. Each is a separate theory of law. Each exists in a distinct legal pigeonhole. *Adams* and *Fike* are not applicable to the instant case in that they deal with the concept of lesser included offenses.

The appropriate test to apply to the instant case is found in *State v. Dunn,* 243 Kan. at 432-33, where the court stated:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute provides proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap.

. . . .

"We have held that the proper test for determining whether an underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide. If this is not true, then the felony must be a separate and

distinct offense and the doctrine of merger does not apply. *State v. Rueckert,* 221 Kan. 727, 733, 561 P.2d 850 (1977). A more correct formulation of the proper test when considering merger is whether the elements of the underlying felony are so distinct from the homicide so as not to be an ingredient of the homicide. *State v. Lashley,* 233 Kan. 620, 631, 664 P.2d 1358 (1983)."

In the instant case, attempted rape is a crime wholly independent of murder. K.S.A. 21-3401 defines murder as "the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony."

Rape is defined in part by K.S.A. 21-3502 as "sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances: (a) When the victim is overcome by force or fear; (b) when the victim is unconscious or physically powerless."

Clearly, the elements of rape are not included in the elements of murder. By applying the test set forth above as quoted from *Dunn,* we conclude the defendant was properly convicted of both attempted rape and felony murder.

Affirmed.

SIX, J., not participating.