No. 70,680 [1]

STATE OF KANSAS, *Appellee*, v. ARTIS SWAFFORD, *Appellant*.
(897 P.2d 1027)

---

[1] **REPORTER'S NOTE:** For modified opinion, see 257 Kan. 1099.

Opinion filed June 13, 1995.

*Jean K. Gilles Phillips,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Julie McKenna*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Artis Swafford appeals a decision of the district court convicting him of felony murder and aggravated robbery. He argues that the district court erred by (1) denying his motion for change of venue, (2) by admitting hearsay statements of codefendant Juan Anthony, (3) by allowing evidence of his commission of prior crimes at the same location, and (4) by imposing consecutive sentences for felony murder and aggravated robbery, thereby violating his right to freedom from double jeopardy. Finding no reversible error, we affirm.

Early in the morning on August 10, 1992, the Mid-America Inn in Salina was robbed and the night clerk, Oliver Bigler, was murdered. Police were called to the scene by Audrey Wright, who arrived at the motel at approximately 4:50 a.m. to open the restaurant, found the door locked, and was unable to summon the night clerk.

Officer Glen Soldan of the Salina Police Department arrived at the motel at 5:30 a.m. Soldan found the motel safe laying in the grass near a white plastic ice bucket and a canvas bag a short distance from the back door. He attempted to enter the motel through the back door, but the deadbolt lock was engaged.

Eventually, the manager of the motel arrived with a key to the motel office. The police found the office area splattered with blood; they discovered Bigler's body lying in front of the desk. Bigler had sustained severe trauma and lacerations to the head; a letter opener was embedded in Bigler's neck.

David Klamm, a special agent with the Kansas Bureau of Investigation, searched the office area. He found a broken and blood-stained BB gun along with some pieces of wood that looked as if they had come from the stock of the gun. Kelly Robbins, a KBI forensics examiner, found a blood-stained brick. Officers also found what appeared to be a broken piece of a collapsible antenna. A police dog searched the wooded area east of the motel and discovered a handgun.

An autopsy revealed that Bigler had suffered severe trauma to the head as well as severe stab wounds and lacerations, including a stab wound in the right ear canal. In the opinion of Dr. Norman Macy, death was caused by several severe blows which destroyed the front of the head and tore the brain in half. The head injuries were consistent with those that could have been caused by a brick or gun stock.

Defendant Artis Swafford was arrested and charged with premeditated murder, felony murder, and aggravated robbery. Three other individuals, Juan Anthony, Joel Butler, and Jennifer Harmon were also charged as a result of the murder and robbery. Anthony, Butler, and Swafford were tried jointly.

On December 16, 1992, a hearing was held concerning several motions filed by the parties. The State asked that it be allowed to use prior crime evidence pursuant to K.S.A. 60-455 concerning two previous robberies of the motel. The State argued that Swafford had previously made statements linking the defendants to the crimes. The State wished to use these prior crimes to show identity, plan, and intent. The court ruled that if the State could present foundation evidence linking the crimes, evidence of the prior crimes would be allowed.

All defendants moved for separate trials. Swafford and Butler expressed concern about statements made by Juan Anthony to a confidential informant implicating them in the crime. The court asked the defendants if excising any statements made about Swafford and Butler from the statement would cure the prejudice. The court then took the matter under advisement.

Swafford and codefendants Anthony and Butler filed a motion for change of venue, contending that pretrial publicity created a substantial likelihood that they would not receive a fair trial. In support of the motion, Randall Picking of KSAL radio in Salina was called and testified that his station broadcast a call-in show that dealt with the crime on the day of the defendants' arrests. Raymond Pollard, vice-president of KSKG radio in Salina, was also called as a witness and stated that his station reported stories on the murder, including the names of the persons arrested. George Pyle, editor of the Salina Journal, testified that he published articles which had

detailed the prior convictions of Anthony as well as stories which stated that Anthony's neighbors were afraid of him because he and his friends carried guns and had all-night parties. Pyle also stated that the Salina Journal printed a story on the trial testimony with a headline stating that Anthony had planned the robbery and murder. Other radio news directors testified that they had run stories on the murder and the suspects.

At the hearing on the motion to change venue, the defendants presented the testimony of Dr. James Franke, the director of the Survey Research Unit at the Kansas State University Institute for Social and Behavioral Research. Dr. Franke testified that he had conducted a public opinion poll to test the public's knowledge of the case. The results of the survey indicated that out of approximately 366 persons surveyed, 97% had heard of the case and approximately 50% thought that the evidence was strong against all the suspects.

The district court determined that the defendants had failed to show prejudice to such a degree that it would be impossible to obtain an impartial jury. Accordingly, the court denied the motion.

The court then took up again the motion for severance of defendants. The district court stated that many of the alleged hearsay statements would be admitted under the conspiracy exception to the hearsay rule. The court ordered that any other hearsay statements regarding Swafford and Butler should be redacted. Accordingly, the court denied the motion to sever.

The trial commenced as scheduled on February 16, 1993. The State called Marilyn Jensen, who testified that she was traveling through Salina in the early morning hours of August 10, that she stopped at the Mid-America Inn around 1:00 or 2:00 a.m., and that an older gentleman, presumably Bigler, told her there were no vacancies and directed her to the Ramada Inn. The desk clerk at the Best Western Heart of America Inn, another motel in Salina, testified that the last contact she had with Bigler was at 2:00 a.m.

Officer Randy Jennings of the Salina Police Department testified that he had stopped Anthony at approximately 2:38 a.m. for running a red light. According to Jennings, Anthony drove off heading north after receiving a traffic warning. Earlier that evening, Jen-

nings had arrested Orvin Mixon for driving while suspended. Swafford was a passenger in the car and was allowed to drive Mixon's auto away.

Don Dean, general manager of the Mid-America Inn, testified that there were only two keys to the back door, one of which was kept at the office. He identified the safe found outside the door as the one that was kept in the office and the place where all the business proceeds and receipts were kept. He identified the white bag found outside as the bank bag where the small bills were kept.

Robert Taylor, a desk clerk at the Mid-America Inn, stated that in order to open the cash register, the button marked "room number" must be depressed. There had been two previous robberies of the motel that summer, and everyone who worked there thought it was an "inside job" because during the second robbery the robber knew how to open the cash register.

Lieutenant Kiltz, along with other officers from the Salina Police Department, executed a search warrant for the home of Anthony and his mother. Kiltz found a .38 revolver inside Anthony's bedroom. Officer Mike Briggs found a battery-operated walkie-talkie with a broken antenna inside an empty dog food bag. The antenna piece found at the crime scene matched the piece of the antenna found in Anthony's trash can. Sergeant Sweeney found another walkie-talkie, a $10 roll of quarters, and a Tec 9 handgun.

The State called Kit Phifer, who testified that she knew the defendants and that on August 9 she was with friends Karen Renee Greer, Sunshine Daniels, and Stephanie Neustrom. According to Phifer, the other girls took her home early that evening. The next morning she called Greer. Phifer asked Greer if she knew about the robbery, and Greer indicated that she did. Later, Greer told Phifer that Anthony had showed her a key to the motel office.

Daniels testified that she had known the defendants for about a year but that the night of August 9 was the first time that Greer had met Anthony. According to Daniels, after the group had dropped Phifer off, they went to Anthony's house. Daniels testified that Greer told her the next day that she and Anthony had gone to a barbecue at Orvin Mixon's house the night of the crime. However, Daniels said that Greer later told her that Anthony had

planned the murder and told her about it. Daniels also testified that Greer told her that she had sex with Anthony that night.

At this point, the attorneys for defendants Swafford and Butler objected on the ground that anything Greer told any of the girls as to what Anthony told her was hearsay and inadmissible. Earlier, they had made the same objection when Phifer was testifying, although no hearsay information had actually been elicited. The district court had overruled the previous objection on the ground that any statements would be subject to the conspiracy exception. The court again made the same ruling.

Krista Young then testified that in August 1992 she lived with Orvin Mixon. On August 9-10, they had a barbecue. According to Young, Swafford and Butler had been at the barbecue most of the evening. She testified that she went to bed around 3:00 or 4:00 a.m. and did not see Anthony at the barbecue. Immediately afterward, however, she testified that she had seen Anthony at the barbecue, but she had not seen Anthony, Swafford, and Butler leave together.

Stephanie Neustrom testified on behalf of the State that she had a sexual relationship with Joel Butler. A few days after the crime, Neustrom talked with Greer, who told her that Anthony had left the house in the middle of the night to rob the Mid-America Inn.

Once again, the defendants' attorneys made hearsay objections, which were overruled. Neustrom went on to relate that Greer told her Anthony had planned to rob the motel and injure the clerk. Greer also told Neustrom that she helped him count money when he returned. Neustrom asked Greer if Butler was involved, and Greer told her that Butler did not know what was going to happen when he got into the car with Anthony and waited outside.

At this point, Butler's attorney lodged a hearsay objection, which was overruled. Neustrom then testified that Greer told her Swafford and Anthony were supposed to hit the clerk but that when the clerk did not go down, Swafford went back outside.

The trial court overruled hearsay objections on the basis of the conspiracy exception to the hearsay rule. Neustrom was permitted over objection to relate that Greer told her Anthony had planned

to rob the motel and injure the clerk and that Greer helped Anthony count money when he returned.

Greer was called as a witness for the State. She stated that after taking Daniels and Neustrom home, she and Anthony went back to his house and had sex. Sometime after 2:30 a.m., Anthony told her that he, Butler, and Swafford were going to rob a motel and kill the night clerk by shoving a sharp object down his throat. Anthony showed her the key they were going to use to get into the motel. Before Anthony left she saw some walkie-talkies, and Anthony showed her a sharp object which looked like a nail file. However, she testified that the object was not the letter opener found in Bigler's body.

According to Greer, Anthony returned later and told him that he had been at Mixon's house. However, he was carrying some money, and Greer helped him count it. Greer also testified that at one time she considered herself engaged to Anthony and that she had previously lied to police and given alibi testimony for him.

Ramona Keil was a night clerk at the Mid-America Inn. She had been on duty during the two previous robberies at the motel. She stated that on May 31, 1992, a man entered that motel, asked for a room, and then hit her on the head when she turned to look at the clock, and continued to hit her until she passed out. Eventually, she was thrown into the restroom, and she heard someone hitting the cash register keys. The person was unable to open the register, and nothing was taken.

Keil testified that on July 7 the front and back doors of the motel were locked. She was watching TV in a room next to the office when she heard glass break. When she went out into the lobby she saw the man from the first robbery, who proceeded to hit her with a black club. She was then kicked and thrown into the restroom. This time the assailant was able to open the cash register. Keil identified the defendant Swafford at trial as the person who committed the crimes, although she had previously been unable to identify him.

Jennifer Harmon testified and admitted that she had been charged in the murder and robbery and had agreed to testify in exchange for the State's agreement to drop the murder charge.

Harmon stated that she was 17 at the time of the murder and had known Anthony since she was 11 years old. She testified that Anthony had previously worked at the restaurant at the Mid-America Inn, which was owned by Harmon's grandparents. Harmon stated that she returned to Salina in 1991 after living in Topeka for some time, that she reestablished contact with Anthony, and that they began a sexual relationship in the winter of 1991. Harmon began working the 3-11 p.m. shift at the motel in April 1992.

After the first attempted robbery of the motel, Harmon went to Anthony's home and Swafford was there. As Swafford left, he asked Harmon "how the bitch was." Harmon testified that Anthony later told her that Swafford had gone into the motel and hit Ramona Keil on the head. Anthony stated that they had been unable to get into the cash register. Harmon told Anthony that the "room number" button had to be used to open the cash register.

Harmon stated that at one time she gave Anthony and Butler a ride to Junction City. On the trip, Anthony asked her to get him a copy of the keys to the motel. Butler also encouraged her to get the key for Anthony. Eventually, she agreed to leave the key where Anthony could pick it up and copy it.

After the second robbery at the motel, Harmon again went to Anthony's house. Anthony was outside with Swafford, and Swafford again asked her "how the bitch was." Later that summer, she was in Anthony's room when she noticed some walkie-talkies. Harmon testified that Anthony asked her if she would let him rob the motel while she was on duty so that he would not have to split the money with Swafford and Butler. Butler's attorney objected on the grounds of hearsay, but the objection was overruled. Harmon refused to agree to be robbed.

Harmon testified that she became scared of Anthony and wanted out of the relationship. She stated that she gave Anthony money and clothes so that he would stay out of trouble. According to Harmon, Anthony was blackmailing her with a videotape of them having sex, which he threatened to expose.

Harmon stated that when she heard about the robbery and murder, she suspected Anthony. She went to Anthony's house and found him sleeping; when she asked how he could sleep after what

he had done, defendant Anthony told her that he had "no conscience."

Detective Gerald Shaft of the Salina Police Department testified that as part of a drug sting operation the department had rented two apartments in a building in Salina. Shaft and another officer occupied one apartment, and Lamar Williams, a confidential informant, occupied the other. Williams' apartment was wired with videotape and sound so that the officers in the other apartment could monitor drug transactions.

At this point, the State sought to question Shaft as to certain statements Williams had made to him regarding information Anthony had given to Williams. Butler's attorney objected on the grounds of hearsay. The district court overruled the objection, citing the conspiracy exception to hearsay. Both Butler's and Swafford's attorneys lodged a continuing objection to the testimony.

Shaft testified that Williams told him he had talked to Anthony prior to the crime and that Anthony had asked him to participate in a robbery and murder at a motel. Shaft also testified that following the crime Anthony went to Williams' apartment to sell drugs. In a conversation that was both videotaped and audiotaped, Anthony told Williams about the crime and demonstrated how the murder had been committed.

Shaft also testified that he had interviewed Anthony after Anthony's arrest. At first, Anthony denied any involvement. After being told of the existence of the tapes, Anthony became visibly upset, unable to believe that Williams was working for the police. When another officer asked Anthony why he would commit such a crime, Anthony stated, "Because it was peer pressure." According to Shaft, Anthony also stated, "I'm going to get the Hard 40 for this."

Lamar Williams then testified. Williams stated that during the time the crime was committed he was working on drug buys for the police and knew all three defendants. According to Williams, Anthony told him he was going to rob the motel, Swafford was going to knock out the clerk, and Anthony was going to slit the clerk's throat.

Williams testified that the night after the robbery and murder occurred, Anthony came to his apartment to sell drugs. While

there, Anthony talked about the crime. Williams stated that Anthony had also talked about the previous robberies at the motel. Anthony had told Williams that he had a girl that would do anything for him and that the girl made him a key to the motel. Anthony said that in the previous robberies, Swafford had gone into the motel and knocked out the clerk, Butler had been the lookout man outside, and Anthony had been the brains behind the operation.

Williams also testified that he had talked to Swafford about the murder of Bigler. All Swafford said was, "He was old, he was going to die anyway." When Williams told Swafford that Anthony had told him all about the murder, Swafford said, "Juan talked too much." Swafford also stated, "Man, we went up to that motherfucker and—and the dude wouldn't give up so we had to fuck him up, man."

Mike Marshall, a sergeant with the Salina Police Department, testified that he was in the upstairs apartment while Anthony was describing the crime to Williams in the downstairs apartment. He identified the videotape and audiotape as the tapes made that night. The videotape and audiotape were played for the jury. They are not a part of the record on appeal.

Kelly Robbins, a KBI forensics examiner, also testified on behalf of the State. She stated that she found blood on the seats of the Geo Metro owned by Anthony's mother. There was also blood present on a T-shirt, a sock, and a pair of sweatpants found at Anthony's residence. According to Robbins, the blood on the sweatpants was consistent with Bigler's blood and could not have come from either Anthony or Swafford.

Chad Johnson, a worker at Alco, also testified on behalf of the State. Johnson testified that during the summer of 1992 he had copied a key for Butler.

Swafford presented an alibi defense. Kenneth Green testified that he had been at Mixon's party, left for a while, and then came back around 1:00 a.m. According to Green, he, Butler, and Swafford left to buy cigarettes soon after, drove by Benton's Cafe, and then went back to the party where they all remained for the rest of the evening. Trish Wilson, Swafford's girlfriend, testified that

Swafford left the barbecue once to get ice with Mixon and later left with Green and Butler to buy cigarettes.

Swafford himself also testified. He stated that he went to the barbecue with Wilson and then left and went to Williams' house around 11:00 or 12:00. He went back to the barbecue and then left to get ice with Mixon. Following their run-in with police, he had to bail Mixon out of jail. Finally, around 4:00 a.m., he left with Green and Butler to get cigarettes. After his return, he did not leave the barbecue for the rest of the night.

Swafford testified that he did not care much for Anthony because Anthony was a bragger and a liar. He also testified that he and Lamar Williams were associates but not friends and that they had recently had a fight over a girl. Swafford maintained that Williams had lied about Swafford's statements concerning the robbery.

During deliberations, the jury sent a question to the judge concerning the redacted transcript of the videotape. The jury asked, "If we have established that defendant Swafford and Butler were there, can we use this as evidence?" The agreed-upon answer given to the jury by the trial court was that the statement could not be used as evidence against Swafford and Butler.

Swafford was convicted of felony murder and aggravated robbery. He was sentenced to a term of life for the felony murder and a term of 15 years to life for the aggravated robbery, to run consecutively.

## CHANGE OF VENUE

Swafford contends that the district court erred in denying his motion for change of venue because the pretrial publicity created so great a prejudice that he could not obtain a fair and impartial trial in Saline County. K.S.A. 22-2616(1) provides that the court shall, upon motion of the defendant, transfer the case to another county if it is satisfied that there is so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial.

The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant. *State v. Lumbrera*, 252 Kan. 54, 57, 845

P.2d 609 (1992). The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial. 252 Kan. at 57.

As a threshold question, the State claims that Swafford waived the change of venue issue by failing to renew the motion at the conclusion of jury selection. In support of this contention, the State cites *State v. Bierman*, 248 Kan. 80, 88, 805 P.2d 25 (1991, and *State v. Richard*, 235 Kan. 355, 365, 681 P.2d 612 (1984). Neither of these cases stand for the proposition that a defendant must renew the motion immediately following voir dire or see the objection waived. Rather, each of these cases notes that the defendants chose not to renew their requests at any time after the completion of voir dire, indicating that nothing new had arisen during voir dire that would show problems with finding an impartial jury. See *State v. Bierman*, 248 Kan. at 88; *State v. Richard*, 235 Kan. at 365. Swafford's attorney renewed his request for change of venue the next day. We find no merit in the State's argument that the motion for change of venue was waived.

Swafford argues that the nature of the pretrial publicity created overwhelming prejudice. It is true that the crime and the arrest of the defendants were highly publicized. However, media publicity alone has never established prejudice per se. *State v. Grissom*, 251 Kan. 851, 927, 840 P.2d 1142 (1992). The burden is on the defendant to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. 251 Kan. at 927.

Swafford presented a survey conducted by the Kansas State University Institute for Social and Behavioral Research in support of his motion. The survey consisted of an interview with 366 persons in the Salina area. It revealed that 97.5% of those surveyed had heard about the case and the suspects, and 49% of those surveyed felt that the evidence was strong against all four suspects, 15.8% of those surveyed felt that the evidence was strong against some suspects and weak against others, and 49% of those persons felt the evidence was strong against Swafford. Thus, 57.1% of the total

surveyed felt the evidence was strong against Swafford. Of those surveyed, 18% felt that they could not be impartial if asked to serve on a jury, 9.3% felt it was unlikely they could be impartial, 24.3% felt that it was likely that they could be impartial, 29.9% felt that it was very likely that they could be impartial, and 18.6% had no opinion.

There were motions made by all defendants regarding individual voir dire. However, the district court denied the motions and determined instead that problems could be avoided by summoning different panels at different times to prevent contamination of the jury pool at large. Six separate panels of prospective jurors were summoned and questioned by the court and counsel. In denying the motion for individual voir dire, the court offered to revisit the motion if a problem occurred when picking a jury.

The record reveals that each of the defendants' counsel asked questions regarding pretrial publicity, including whether the jurors had formed an opinion and in the case of Anthony's attorney, whether that opinion was strong against one or all three defendants. Of the first panel of 18 jurors, 5 jurors indicated that pretrial publicity had led them to form an opinion, and they were dismissed for cause. The judge also asked questions of the jury regarding pretrial publicity at juror orientation. In the second panel, Swafford's attorney asked for a show of hands from those people who felt Swafford was guilty. The two persons who said yes were dismissed for cause. All attorneys asked questions of the third panel concerning publicity. From the third panel, five persons said they had been affected by the pretrial publicity but only two of those five were asked to be stricken by the defense attorneys. Those two were stricken for cause.

On the fourth panel of 25 jurors, 12 felt that they knew a great deal about the case and had at least started to form their own opinions. Of those 12, 10 were asked to be stricken for cause. Seven of those were stricken but three who claimed that they would try to be impartial were left on. Both the judge and the attorneys asked questions about publicity. Of the fifth panel of 24, only 2 stated that they might have formed an opinion, and both stated that they could set that aside and be impartial. However, one was dismissed

for cause. On the last panel of 25, only 2 expressed an opinion of the case, and they were dismissed for cause.

The court qualified 90 of the jurors for use on the jury panel. Each defendant then received 12 peremptory strikes, and the State received 36 strikes. The defense struck the three persons challenged for cause on the third panel that had not been stricken for cause.

On the whole, the court questioned only 125 jurors to arrive at a jury pool of 90. The record discloses that the attorneys had few, if any, problems in questioning jury members about the effects of publicity. All but three of the challenges for cause because of pretrial publicity were granted, and the remaining three challenged venirepersons were taken off by peremptory strikes. The whole selection process lasted two days. Although jury selection was drawn out due to the district court's precautions, it was not inordinately difficult to pass a pool of jurors for cause. No objections were made about the process following the selection.

We hold that the court did not abuse its discretion in denying Swafford's motion for change of venue. In concluding our discussion of this contention, the following quote from *State v. Ruebke,* 240 Kan. 493, 500-01, 731 P. 2d 842, *cert. denied* 483 U.S. 1024 (1987) is appropriate:

"Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice. There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue."

## ADMISSION OF HEARSAY STATEMENTS

Swafford contends that the district court erred in admitting statements made by Anthony to others. He argues that because Anthony was a codefendant and did not testify, his statements were

inadmissible hearsay. Prejudice, he claims, is established because there is little evidence to connect him to the murder and robbery.

The Confrontation Clause of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees the right of a criminal defendant to be confronted with the witnesses against the defendant, including the right to cross-examine those witnesses. *Richardson v. Marsh*, 481 U.S. 200, 206, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987). An accused's right of confrontation is violated when the confession of a codefendant implicating the accused is received in evidence in a joint trial. *Bruton v. United States*, 391 U.S. 123, 137, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).

Swafford first complains of the admission of the excised videotape of Anthony's statements to Lamar Williams. He argues that even though his name is edited from the videotape, the tape still clearly implicates him in the crime. The State, on the other hand, argues that because Swafford did not object to the playing of the tape, he has waived consideration of this issue.

It is important to note that the statements made by Anthony to Williams on the tape would not be admissible under the coconspirator exception to hearsay as they were made the night after the robbery, which was after the conclusion of the conspiracy. The district court recognized this and ordered that the tape be redacted.

Whether editing a confession or statement by excision will avoid a violation of the *Bruton* rule must be determined on a case-by-case basis. *State v. Hutchinson*, 228 Kan. 279, 282, 615 P.2d 138 (1980). Editing may be proper when any suggestion of the codefendants' involvement in the crime charged can be eliminated from the confession or statement, but generally an edited statement should not be admitted if it explicitly suggests the participation of the complaining defendant. 228 Kan. at 282. If an edited statement of a codefendant is clearly inculpatory as to the defendant and vitally important to the prosecution's case against the defendant, it should not be admitted. *State v. Rakestraw*, 255 Kan. 35, Syl. ¶¶ 1, 2, 871 P.2d 1274 (1994); *Hutchinson*, 228 Kan. at 282.

In this case, however, we are unable to determine whether the excised statement explicitly suggested the participation of Swafford

because neither the excised version of the tape nor the excised transcript of the tape is included in the record on appeal. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, a reviewing court presumes that the action of the trial court was proper." *State v. Richard*, 252 Kan. 872, 874, 850 P.2d 844 (1993).

At trial, Swafford made no objection to the admission of the excised audiotape and videotape, and the jury was specifically instructed not to consider Anthony's statement against Swafford. While Swafford did object to the transcript of the excised tape, it was only because he felt that the original tape was unclear in some areas and doubted the accuracy of the transcript. "The erroneous admission of evidence may not be raised as an issue on appeal unless there appears of record a timely objection so stated as to make clear the specific ground of the objection." *State v. Wilson*, 247 Kan. 87, 98, 795 P.2d 336 (1990).

Swafford also argues that the district court erred in admitting statements made by Anthony to Jennifer Harmon and Karen Renee Greer, as well as the testimony by Sunshine Daniels, Kit Phifer, and Stephanie Neustrom relating those comments, under the coconspirator exception to the hearsay rule. Swafford, relying on the case of *State v. Schultz*, 252 Kan. 819, 842-44, 850 P.2d 818 (1993), argues that even if the provisions of the exception exist, there must also be evidence independent of the hearsay statements themselves which establishes a substantial factual basis for the existence of a conspiracy; Swafford claims no such evidence exists.

K.S.A. 60-460(i)(2) provides an exception to hearsay for those statements

"which would be admissible if made by the declarant at a hearing if . . . the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

In order to show a conspiracy, it is not necessary that there be any formal agreement manifested by formal words written or spo-

ken; it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. *State v. Sherry*, 233 Kan. 920, 934, 667 P.2d 367 (1983). Although a close question, we believe that the statements made by Swafford to the confidential informant, Lamar Williams, indicate that he participated in the robbery and murder. Furthermore, the antenna of the walkie-talkie found at the scene indicates that some planning went into the crime. Testimony by Ramona Keil identifying Swafford as the person who committed the two previous robberies, together with evidence of the manner in which the two prior robberies took place, shows planning between Anthony and Swafford for the present robbery. In the first robbery, the robber was unable to gain entrance to the cash register; however, after Harmon told Anthony how to work the register, the robber was able to gain access to the money during the second robbery. All of these facts provide independent circumstantial evidence that a conspiracy between Swafford and Anthony to burglarize the motel existed, and we are satisfied that the hearsay statements related to and were made during the course of the conspiracy.

Swafford also argues that there was no showing of a particularized guarantee of trustworthiness regarding the statements as required by *State v. Myers*, 229 Kan. 168, 172, 625 P.2d 1111 (1981). In *Myers*, this court found that hearsay evidence may be admissible if the declarant is shown to be unavailable and there is an indicia of reliability so as to afford the trier of fact a satisfactory basis for evaluating the truth of the statement. 229 Kan. at 172. However, *Myers* also quotes *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), for the proposition that reliability can be inferred, without more, in a case where the evidence falls within a firmly rooted hearsay exception. In this case, the hearsay testimony falls within the coconspirator exception, a firmly rooted hearsay exception.

## EVIDENCE OF PRIOR CRIMES COMMITTED
## AT THE SAME LOCATION

Swafford contends that the court erred in allowing evidence of

the prior commission of robberies at the motel to be admitted. He argues that there was insufficient evidence to show that he committed the previous crimes.

K.S.A. 60-455 states:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

A ruling on the admissibility of prior crimes evidence pursuant to K.S.A. 60-455 is within the discretion of the trial judge. *State v. Searles*, 246 Kan. 567, 579, 793 P.2d 724 (1990).

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. [Citation omitted.]" *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991).

In determining whether to admit evidence of a prior crime, the trial court must determine it is relevant to prove one of the facts specified in the statute, determine the fact is a disputed material fact, and balance the probative value of the prior crime evidence against its tendency to prejudice the jury. *State v. Blackmore*, 249 Kan. 668, 671, 822 P.2d 49 (1991).

In this case, the evidence of the prior robberies was clearly relevant to prove identity, intent, and plan. All of these facts were materially disputed. The only question is whether the probative value of the evidence outweighed its tendency to prejudice the jury. Swafford contends that because his identity as the culprit in the prior crimes was in question, the evidence was more prejudicial than probative.

Prior to trial, Ramona Keil was not able to identify Swafford as her assailant in the two prior robberies at the motel. However, she was able to identify him as her assailant in the two prior robberies when she took the stand to testify. Her identification, combined

with Jennifer Harmon's testimony about statements made to her by Swafford on the days after the two previous robberies, raises an inference that Swafford committed the previous offenses. Under these circumstances, we conclude, as did the trial court, that the probative value outweighed any prejudice to the defendant.

Swafford contends that his sentences for felony murder and the underlying crime of aggravated robbery constitute double jeopardy. He argues that to be sentenced both for felony murder and for the underlying felony results in multiple punishments for the same offense.

This exact issue has been addressed by this court. In *State v. Dunn*, 243 Kan. 414, 433, 758 P.2d 718 (1988), we determined that conviction and sentencing for both felony murder and the underlying offense does not constitute double jeopardy. We reached the same result in *State v. Gonzales*, 245 Kan. 691, 707, 783 P.2d 1239 (1989), and *State v. Bailey*, 247 Kan. 330, 340, 799 P.2d 977 (1990), *cert. denied* 114 L. Ed. 2d 108 (1991).

Swafford acknowledges our decisions in these cases but asks us to look anew at the situation. He argues that because the underlying felony is used to convict the defendant of first-degree murder, then all underlying felonies are lesser included offenses of felony murder. We find his argument unpersuasive and adhere to our decisions in *Dunn, Gonzales,* and *Bailey*.

Affirmed.