No. 60,741

STATE OF KANSAS, *Appellee,* v. RICHARD JOSEPH LONGOBARDI, *Appellant.*

(756 P.2d 1098)

Opinion filed June 24, 1988.

*Shannon Crane,* assistant appellate defender, argued the cause, and *Benjamin C. Wood,* chief appellate defender, and *Brad L. Keil,* assistant appellate defender, were on the brief for appellant.

*Jerome A. Gorman,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Nick A. Tomasic,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J: This is a criminal appeal. Richard Longobardi was convicted of first-degree murder, K.S.A. 21-3401, and aggravated robbery, K.S.A. 21-3427. He was sentenced to life imprisonment for murder and 15 years to life for aggravated robbery, to run concurrently with the sentence for murder.

This is the saga of an extended family and the consequences of its experience in drug dealing. Richard and Cindy Gitchell, with Cindy's three children by a previous marriage, Carey, Lee, and Georgia Payne; Cindy's father, Roscoe Stewart; and Richard Longobardi, Georgia Payne's boyfriend, all lived as one extended family in both units of an up and down duplex in Kansas City, Kansas. Kevin Stewart, the family advisor and brother of Cindy Gitchell, was in the drug rehabilitation unit at Osawatomie State Hospital.

On June 21, 1986, Richard Gitchell asked his 19-year-old stepson Carey Payne to make arrangements for him to buy 20 pounds of marijuana for $13,000. Carey agreed to comply with

the request; he knew a supplier from St. Louis. But temptation, sparked by the cash involved, raised its ugly head. Carey began to scheme of a way to steal the money from his stepfather without delivering the marijuana. Carey and Richard Longobardi discussed the opportunity and came up with a plan.

The plan was for Scott Spear, a family friend, to put his two guns in his car and pick up Longobardi, Lee, and Georgia. Spear and Longobardi would hide in some tall weeds near the rendezvous point at the Rosedale State Bank, Lee would drive the car across the street and wait in a Pizza Hut parking lot, and Carey and Gitchell would drive up and stop behind the bank. Carey would walk to the front of the bank, leaving Gitchell in the car, and Spear and Longobardi would come out of the weeds armed and wearing ski masks, and demand the drug money from Gitchell. Carey would, during the robbery, signal the getaway car, and all would escape in Spear's car with the money.

All the preliminaries went according to plan as if all had agreed to it. However, Longobardi claimed he was in the car with Lee and Georgia, fast asleep and oblivious to what was going on, and Lee and Georgia claimed they were unaware of the plan and thought they were going to a movie.

The one hitch in execution of the plan was that before Gitchell could be robbed, he was killed. Spear testified Longobardi shot Gitchell because Gitchell started towards Spear while Spear was searching the car for the money. Spear then turned around and shot Gitchell. Carey testified when he came back behind the bank and saw his stepfather lying on the pavement, he rolled him over and took $800 from his pocket before Longobardi shot him once again in the head.

Carey then found the rest of the money in the car, and headed for Spear's car across the street, stuffing "two grand, maybe three" in his pocket as he ran. When Carey reached the car, Lee drove back to pick up Spear and Longobardi, and all five of them drove off, leaving Gitchell lying on the pavement. They then drove to an isolated area and dumped the guns. Lee, by this time, wanted the advice of his uncle, Kevin Stewart. They drove to Osawatomie to see him, but because it was about 1:30 a.m. when they arrived, they had to talk to him by phone. Carey and Longobardi told Kevin everything that had happened.

Kevin testified Carey did not try to pretend Longobardi was

the only one involved in the shooting. Kevin said Longobardi told him he sat in the weeds while Spear was robbing Gitchell and when Gitchell "started going towards Scott," Longobardi tried to shoot warning shots over Gitchell's head, but instead hit him. Kevin testified Carey told him how he got the money from Gitchell's pocket and the car, and that both Carey and Longobardi told him where they had dumped the weapons. With the help of the police, Kevin located one of the weapons in the area Carey and Longobardi had told him about.

On the way back from Osawatomie, Carey divided the money not already in his pocket among the men. He said he did not think anyone saw him put the extra money in his pocket, so he offered a little over $3,000 each to Spear and Longobardi, who accepted it. Spear agreed this is what happened. Carey said he offered some money to Lee, but Lee didn't want "blood money," so Carey kept it.

Several days later, on the night of Gitchell's funeral, Carey got drunk and told his grandfather, Roscoe Stewart, what had really happened. The grandfather had already taken his daughter, Cindy, and his two grandchildren, Lee and Georgia, to the police station to give a more accurate version of events than they had previously given investigators. Cindy admitted for the first time that her husband had arranged with Carey for a drug buy behind the bank, and Lee and Georgia admitted they heard shots, saw their stepfather dead, and drove around while weapons were discarded and money counted, but denied they had known of the plan before it was executed. Neither Lee nor Georgia were charged with the death of their stepfather.

After Carey's confession, Roscoe Stewart encouraged Carey and Longobardi to give statements to the police. The statements given by everyone eventually led to the arrest of Spear, Carey, and Longobardi. Spear's version of events was essentially a straightforward account of events as has been described. He neither tried to shield nor implicate Longobardi. He said they had both waited to rob Gitchell, and they both shot him. Spear pled guilty to second-degree murder, armed robbery, and assault with a deadly weapon and was sentenced to 15 years to life on each count.

Carey's statement was similar to Spear's, except he insisted the plan was originally Longobardi's. Longobardi testified Georgia

had talked him into going to the movies with everyone that night, even though he had only had a couple of hours of sleep the night before and was very tired. He said he kept falling asleep in the back seat of the car and did not know what was going on until he heard shots and woke up in the Pizza Hut parking lot. His memory of the rest of the events of the evening generally coincided with the others' testimony, except he said he had never been involved in the robbery or murder, and said he refused to take any of the money.

Neither Carey, Georgia, Lee, nor Spear tried solely to blame Longobardi for the crimes. Carey and Spear nevertheless testified they saw Longobardi shoot Gitchell, and Georgia and Lee agreed they left Longobardi in the weeds behind the bank with Spear and denied he was asleep in the car with them when the robbery and murder took place.

Longobardi was asked on cross-examination why, when he testified he became wide awake after he realized what had happened and could testify perfectly as to where the ammunition and guns had been dumped, he wrote a letter to Georgia saying he was so drunk and drugged he didn't remember *anything* that took place that night. Longobardi said the letter wasn't true, that he wrote it because Carey asked him to contact Georgia to help Longobardi be Carey's alibi, and this was a signal to her how she should testify. He stated he could not explain, exactly, how the letter would help Carey.

Longobardi and Carey were charged with aggravated robbery and first-degree murder and the cases were severed. Longobardi's first trial ended in a hung jury.

The first issue is whether the trial court erred in allowing Carey Payne to invoke the Fifth Amendment when Longobardi attempted to have him called as a hostile witness. The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege protects both a defendant and any other witness whose answers may expose him to future criminal liability. *Lefkowitz v. Turley*, 414 U.S. 70, 77, 38 L. Ed. 2d 274, 94 S. Ct. 316 (1973). See K.S.A. 60-425.

Carey pled guilty to second-degree murder and aggravated robbery pursuant to plea bargaining before testifying as a State's witness at Longobardi's first trial. By the time of the second trial,

he had been sentenced. Carey's time for appeal, rehearing, or sentence modification had not expired. His attorney therefore advised him to assert his privilege against self-incrimination and refuse to testify. Carey had not actually filed an appeal or a motion for new hearing and he provided no explanation of how anything to which he could testify might affect such an appeal or hearing, especially as he declared no intention of challenging the validity of his plea. The court nevertheless recognized Carey's privilege not to testify, and Longobardi made no objection. At Longobardi's request, the court allowed the transcript of Carey's testimony from Longobardi's first trial to be read to the jury.

Carey had testified at the first trial that Longobardi had passed him a note in jail asking him to tell his lawyer Longobardi was asleep in the back seat of the car during the robbery and murder. Carey testified he lost the original note and admitted he forged a copy and passed it to the district attorney claiming it was the original. Longobardi now complains he might have gotten Carey to admit he forged the note at the second trial, or the jury could have discerned, had it been able to observe Carey's demeanor, that Carey was lying about not forging the note. He argues if he had been able to show Carey was a "self-serving liar," the jury could infer the same about Spear, Lee, and Georgia, because their stories were similar to Carey's.

It is interesting to note that the reading of Carey's testimony to the jury from the first trial fulfilled all of Longobardi's objectives. Carey admitted he was a forger and that he had lied. Thus, it was unnecessary for the jury to observe Carey's demeanor to judge his veracity. He admitted his untruthfulness. Nevertheless, Longobardi claims reversible error because Carey was not required to give live testimony of the same facts.

Longobardi also objects that, by not having Carey as a witness, he was prevented from exposing to the jury that Carey had plea bargained with the State. The court did not exclude this evidence, however. The State notes Longobardi could have proffered such evidence through a records custodian, but made no attempt to do so. Longobardi's objection is additionally without merit since the jury learned of Carey's plea bargain through the reading of the transcript of Carey's testimony in the first trial.

Let us now turn to the question before us: At what point does a

defendant's Fifth Amendment privilege against self-incrimination end after his plea of guilty has been accepted? K.S.A. 1987 Supp. 22-3210 requires a trial court, before accepting a defendant's plea of guilty to a felony, to address the defendant personally in order to determine "that the plea is made voluntarily with understanding of the nature and the consequences of the plea." The court must be satisfied there is a factual basis for the plea. In *Boykin v. Alabama*, 395 U.S. 238, 243, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969), the United States Supreme Court said: "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination." The courts of this state customarily explain this right to defendants at the time pleas of guilty are tendered. There is no claim that Carey was not so advised. So far as the record before us discloses, the proceedings culminating in Carey's guilty plea were regular and in full compliance with the law and the Constitution.

The Fifth Amendment operates only where a witness is asked to incriminate himself; that is, to give testimony which could possibly expose him to a criminal charge. *Ullmann v. United States*, 350 U.S. 422, 431, 100 L. Ed. 511, 76 S. Ct. 479, *reh. denied* 351 U.S. 928 (1956).

Carey's subsequent testimony about the crime for which he had already been charged and pled guilty could not expose him to further criminal charges. Further, because he had been sentenced, his testimony could not expose him to additional punishment. We held the privilege extends until a defendant has been sentenced in *State v. Anderson*, 240 Kan. 695, 732 P.2d 732 (1987), because testimony before that time could have an impact on the sentence imposed. In that case, the defendant had moved to withdraw his guilty plea, but the motion had been denied. We noted his appeal time had not yet run on this denial. In the case at bar, Carey made no attempt to withdraw his guilty plea.

We hold that once a plea of guilty has been regularly accepted by the court, and no motion is made to withdraw it, the privilege against self-incrimination ends after sentence is imposed. Syllabus paragraph 2 of *Anderson* is hereby limited to this ruling.

Here, the trial court erred in recognizing the privilege, but under the facts of the case, the error was not prejudicial. The jury

heard all evidence which Longobardi claims could have changed the verdict. Longobardi argues prejudice is shown because the jury deliberated a little over one hour before finding him guilty, whereas in the first trial the jury deliberated for a day and a half before becoming deadlocked 8-4 in favor of finding him not guilty. Length of deliberation is no indication of error. Different juries react differently.

The next issue is whether the trial court erred in failing to declare a mistrial, or at least to interview the jury, when it was informed of an exchange between defense counsel and witness Spear's mother in the courthouse cafeteria during recess.

Nancy Roe, Longobardi's trial counsel, while looking for a place to eat in the crowded cafeteria over the lunch break during trial, asked two women she did not recognize if she could share their table. One of the women said, not in a loud voice, but in a "conversational tone," that she was Spear's mother, and she could not sit with Roe because she hated her and thought she was a terrible person who was ruining her son's life. Roe saw five jurors in the room, but did not know if any of them overheard Mrs. Spear. Only one juror was facing Spear and seemed likely to be able to overhear the conversation.

Roe told the prosecution what had happened, and when the court reconvened, the prosecutor approached the court and stated there had been a problem. Roe related the incident to the court, saying she did not know if it was a problem or not. Roe did not have a suggestion on how to handle the situation, so the court asked the prosecutor if he had an idea. The prosecutor did not know whether the incident, if overheard, would create sympathy for or against the defendant, and suggested the court could either interview the jury or do nothing unless one of the jurors asked about it. The court agreed it was difficult to tell if the incident was overheard, and whether it caused prejudice and against whom, and felt an interview with the jury might emphasize what had happened. The court decided to say nothing and see if it was contacted by a juror about the incident. Roe made no objection to the decision.

The facts are similar to those in *State v. Wheaton*, 240 Kan. 345, 353-54, 729 P.2d 1183 (1986), where a juror approached defense counsel and asked how she could be excused from the jury. Counsel told the juror to contact the judge and then re-

ported the conversation to the court. The juror never approached the judge, and counsel made no objection to the juror remaining and the trial proceeded without interruption. Only after the verdict did counsel argue the defendant was denied a fair trial because of the incident. We held the failure to object to the court's failure to question the juror foreclosed the defendant's right to appeal the issue.

We hold this issue is not properly before us because of defendant's failure to make a contemporaneous objection.

The judgment of the trial court is affirmed.