No. 119,584

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE ARMANDO CONTRERAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 60-404, which requires a contemporaneous objection to the admission of evidence, does not apply to the question of law whether a witness has a right to assert the Fifth Amendment privilege against self-incrimination.

2.

A district court's Fifth Amendment ruling is not a judgment to which the doctrine of acquiescence applies. That doctrine has limited application in criminal cases.

3.

A defendant must be permitted to present a complete defense in a meaningful manner, and exclusion of evidence which is an integral part of a defendant's theory violates the right to a fair trial. A defendant's right to call and examine witnesses, however, is not absolute and on occasion will be overridden by other legitimate interests in the criminal trial process.

4.

The Fifth Amendment to the United States Constitution operates only where a witness is asked to incriminate himself or herself; that is, to give testimony which could possibly expose the witness to a criminal charge.

5.

If a sentence has been imposed for a crime, or if the court has dismissed a count with prejudice, the Fifth Amendment privilege against self-incrimination ends and the witness may be compelled to testify to the facts underlying the conviction and the dismissed charge.

6.

A dismissal with prejudice means that the State may not seek to reinstate the action or bring any claims before any court against the same defendant arising out of the same set of facts as the dismissed count.

7.

The constitutional right to compel a witness to testify is subject to a harmless error analysis.

Appeal from Scott District Court; WENDEL W. WURST, judge. Opinion filed May 29, 2020. Reversed and remanded.

*Kasper Shirer*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MALONE and GARDNER, JJ.

GARDNER, J.: A jury convicted Jose Armando Contreras of four off-grid Jessica's Law offenses and an additional felony—two counts of rape, two counts of aggravated criminal sodomy, and aggravated intimidation of a victim. Contreras appeals his sentence and conviction, arguing the district court denied him a fair trial by allowing a witness to invoke the Fifth Amendment privilege against self-incrimination, denying his continuance request, denying his motion for a sentencing departure, and imposing lifetime postrelease supervision. Contreras also argues that the cumulative effect of the errors requires reversal of his convictions. Agreeing that the district court erred by permitting a witness to invoke the Fifth Amendment, we reverse and remand.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2012, Contreras and the mother of the victim, K.B. (Mother) began dating. Mother would sometimes take her three children—E.B., G.B., and K.B.—to see Contreras. When Mother spent the night at Contreras' apartment, as she sometimes did, she would take her children and they would all sleep in the same room, with the three children sleeping on the floor. At times, Mother would leave her children with Contreras and his roommate while she ran errands. Mother considered his roommate her best friend and would allow him to watch her children two to three times a week.

A little over a year into the relationship, Contreras told Mother that something inappropriate had happened with K.B., then eight years old. Contreras told Mother that K.B. had tried to initiate oral sex with him but he stopped her. Contreras asked K.B. where she had learned that behavior and K.B. replied "daddy says that's what you do for nice things that people do to you." Upon hearing this, Mother made an appointment for the next day with Area Mental Health. She also posted a message on a Facebook group page saying that K.B. had confided in Contreras and had told him about being abused at her father's house over Christmas break in December 2012. The post said that Contreras

3

had waited three days after learning this information before telling Mother. Soon after Mother posted this information on Facebook, a member of the group called police.

After police received a report that K.B. may have been sexually assaulted, Officer Charles Kuffler and Sergeant David Newland went to Mother's home to talk about the accusation. When they arrived, Mother was talking to Contreras over a live video chat on her computer. Mother refused to speak to the police and kept Contreras on the computer the entire time the officers were there. After stating their concerns about the seriousness of the accusations, officers asked Mother to bring K.B. to the Western Kansas Child Advocacy Center for a forensic interview. But Mother remained argumentative and maintained that K.B. may have made up the allegations after seeing something similar in a movie. Eventually, however, Mother agreed to take K.B. to a forensic interviewer.

*Robbins' interview*

Kelly Robbins interviewed K.B. At the beginning of the interview, Robbins described K.B. as "[v]ery bubbly, very talkative, [and] very cooperative[.]" But as she began talking about the abuse, K.B. became less talkative, speaking only to answer questions. She would simply shrug her shoulders to answer, say she did not know, or give one-word answers. In recounting the details of Contreras' assault, K.B. told Robbins that he "had touched her inside her wee-wee . . . he pulled her pants down, went in the front and down her panties, inside her panties, and it was inside her wee-wee with his finger." She also said that "before that happened, he had made her put her mouth on his penis, and he had pulled his shorts down to make her do that." K.B. also told Robbins that her father had sexually abused her while she was staying with him over Christmas break in December 2012.

4

*Fyler's interview and K.B.'s recantation*

After K.B.'s interview with Robbins was complete, she did an extended forensic interview with David Fyler. Fyler interviewed K.B. in three sessions. During the second session, K.B. told Fyler that both her father and Contreras had sexually abused her. According to K.B., Contreras' abuse occurred in his apartment.

In the third session, K.B. recanted her accusations against Contreras. During that interview, K.B. "teared up and said she needed to tell [Fyler] something." Then she told him that what she said about Contreras was not true. When Fyler asked why she wanted to take her story back, she explained that her mother had said that Contreras would lose his son if she did not take back her accusations. Fyler then asked K.B. "would it have been true if [K.B.'s] mom had not talked to her," and K.B. nodded her head yes. So Fyler decided to speak with Mother about the recantation.

After K.B. recanted, Fyler and Robbins spoke with Mother to see if K.B. had been pressured, to make sure K.B. was safe in the home with Mother, and to make sure K.B. was safe from Contreras. Mother told Fyler and Robbins that she did not believe K.B.'s accusations against Contreras. She denied ever having pressured K.B. to recant or change her allegations against Contreras. She also denied having told K.B. that Contreras would lose his son because of K.B.'s allegations. Instead, Mother maintained that K.B. told her she had lied about what happened with Contreras but had told the truth about what had happened with her father. So Mother had told K.B. to tell Fyler "the truth."

*Contreras' interview and arrest*

After K.B.'s initial interview with Robbins, Special Agent Bethanie Popejoy of the Kansas Bureau of Investigation became involved in the case. Popejoy interviewed Contreras at the police station. This interview lasted for around three hours, including

two breaks. After the first break, Contreras was told that K.B. had accused him of sexual assault. Contreras reacted as if he were hurt that K.B. would implicate him. But according to Popejoy, he admitted that when he went into his bedroom to help K.B. get a pen, she pulled his shorts down and put her mouth on his penis. According to Popejoy, Contreras said her mouth had been there for only two seconds before Contreras made her stop and chastised her. K.B. told Contreras that this is what her father liked to do. After the second break in the interview, Popejoy told Contreras that K.B. had said he had touched her vagina. Eventually, Contreras said that after drinking excessively and lying on the floor of his bedroom between K.B. and one of the boys he may have mistaken K.B. for Mother and put his hands on K.B.'s vagina.

Contreras was not arrested until four years after the initial investigation was done. Popejoy suggested that some of that delay was because of K.B.'s inability to testify against Contreras when she was eight years old, as some in her family and in the Department for Children and Families did not think that she could testify.

*K.B.'s therapy statements to Athy*

The State of Kansas took custody of K.B. in March 2014. K.B. was placed in foster care for around two years. After that, K.B. went to Kearney, Nebraska, to live with her Grandmother and Mother later moved to Kearney.

After K.B. went to live with her Grandmother, she began therapy sessions with Susan Athy. K.B. told Athy about Contreras' sexual abuse. In one session, K.B. wrote a letter to Mother because K.B. wanted her to believe her accusations against Contreras, and because she was angry that her mother continued to date Contreras even knowing of her allegations. Athy stated that K.B. was very "specific about the incidents that happened with her . . . but she couldn't put them in order." Yet K.B. was clear when she discussed the individual abuse committed by her father and by Contreras. And K.B. told

6

Athy that she feared Contreras' home because of the sexual abuse that had occurred there. K.B. was worried her brothers could suffer some form of abuse because Mother was still with Contreras. K.B. never told her therapist that she had fabricated any accusations against Contreras.

At various sessions, K.B. detailed the different occasions on which Contreras had sexually abused her. She stated that Contreras made her perform oral sex and had inserted his penis inside her. K.B. then put the incidents in order, dating the sexual abuse by her father and by Contreras on a timeline.

During a 2016 session with Athy, K.B. stated that Contreras had put his penis inside her in the apartment across from Contreras' apartment. She said that Mother, her brothers, and other adults were in the living room of that apartment during the assault. K.B. also drew a picture of the apartment she was assaulted in. She said that two other incidents occurred in Contreras' apartment. She told them that after seeing a television show about victims of sexual assault she had told Mother about the abuse, but Mother had not believed her.

*K.B.'s trial testimony*

In June 2017, the State charged Contreras with two counts of rape, two counts of aggravated criminal sodomy, three counts of aggravated indecent liberties with a child, and one count of aggravated intimidation of a victim. The State amended the charge to two counts of rape, two counts of criminal sodomy, and one count of aggravated intimidation of a victim.

When K.B. testified at trial she was 13 years old. She testified that Contreras had digitally penetrated her vagina, had made her touch his penis with her hand and mouth, and had raped and sodomized her. K.B.'s trial testimony about a rape was somewhat

7

confusing. At first she testified that it occurred in another apartment but then stated that the act in the other apartment involved anal penetration, not vaginal. She then testified that the vaginal penetration had happened in Contreras' apartment when Mother, her brothers, and Contreras' son were playing outside. K.B. also testified to general details about the abuse. She did not know what Contreras' penis looked like because she had never seen it. K.B. did not remember that Contreras' apartment had two bedrooms or that he had a roommate.

She testified that Contreras had told her he would hurt her brothers if she told anyone about the abuse. She did not think she had told Contreras about the abuse by her father. She remembered telling Fyler that she had made up the accusations against Contreras, but she did that because she feared Fyler because he was a man. She never talked with her mother about what happened with Contreras because she was scared.

*K.B.'s father invokes the Fifth Amendment*

Contreras called K.B.'s father (Father) to testify. Before Father was called, the district court permitted the parties to ask Father about an incident between him and K.B. in December 2012, over Christmas break. Father had signed an affidavit saying that during that time, apparently when he still had a relationship with Mother, he had awakened to find K.B. performing unsolicited oral sex on him. In response, the State notified the court of its intent to impeach Father with evidence of his prior convictions for sexual abuse against K.B. As a result, Father told the court that he wanted to invoke his Fifth Amendment privilege against self-incrimination and did not want to testify.

Contreras' attorney argued that Father could not invoke the Fifth Amendment because he had already been convicted of the crime he would be questioned about. The State told the district court that it did not have a copy of Father's plea agreement but it did have a copy of his journal entry of judgment for his prior conviction involving K.B. The

8

district court then asked Father "[w]as part of that plea bargain agreement that you would not have any criminal liability for anything else involving any crimes that you perpetrated with regard to [K.B.]?" Father answered affirmatively, stating he understood that any future prosecution would be barred as double jeopardy.

The district court then reviewed Father's journal entry of judgment. It showed that Father had been convicted of criminal sodomy for acts between April 29, 2011, and March 5, 2012. Because that conviction did not involve any crimes in December 2012, the district court decided not to compel Father's testimony about the incident with K.B. in December 2012. The district court thus found that Father could still be prosecuted for acts with K.B. that had occurred in December 2012—the date Contreras wanted Father to testify about. The district court therefore allowed Father to invoke his Fifth Amendment privilege against self-incrimination and excused him from the trial.

*Contreras' trial testimony*

After the district court excused Father, Contreras testified. He told the jury that one afternoon, Mother left his apartment to grab clothes from her house for her kids, so they could all spend the night at his apartment. That task would have taken her about five minutes. While Mother was gone, her sons were playing video games and K.B. was bored. Contreras asked K.B. if she wanted drawing material and she said she did. So he got off the couch and went into his room to grab a pen and paper. K.B. apparently followed him. As they were leaving the room, K.B. "stopped and went for [Contreras'] shorts and attempted to, and then [Contreras] stopped her." He denied that K.B.'s mouth ever touched his penis. From the time he got off the couch to the time K.B. pulled his shorts down, 10 seconds passed. He took quick action to get K.B. away from him, then yelled at K.B., who apologized for her actions. Contreras asked her "where she would get the idea to do something like that." K.B. responded "[t]hat her dad had . . . said to her that when people do good things for you, you're supposed to reward them."

9

A few minutes later, Contreras' roommate arrived, as Mother did shortly after. That evening, Contreras told his roommate about the incident, but he did not tell Mother about it until three days later. He waited because he was shocked by the revelation that K.B.'s father was abusing her and he "couldn't even imagine what [Mother] was going to go through."

Contreras had never taken the children to another apartment, and he did not have a friend living in an apartment across from him when he was dating Mother.

When confronted with his statements to police on direct examination, Contreras clarified what he thought he had said to them. Contreras maintained that K.B.'s mouth had never touched his penis, and that at the police station he had not meant that her mouth was on him for two seconds. Instead, he meant that K.B.'s attempt to do something sexual to him had taken two seconds. He never admitted to putting his hand on K.B. or mistaking her for Mother but he had merely agreed that was a possible scenario in response to Popejoy's insinuating that inadvertent touching had occurred.

The State's video exhibit of the interview shows, however, that Contreras did admit to the police that K.B.'s mouth went onto his penis, although he denied touching her. But the video supports Contreras' assertion that he simply posed the possibility that he got drunk, laid on the floor, and then mistook K.B. for Mother and put his hand on her vagina. The jury saw the video of Contreras' interview with Popejoy, but because the audio was not working, the jury was given a transcript of the recording. The jury was not allowed to take the transcript into deliberations.

*Mother's trial testimony*

Mother also testified at trial. She did not believe K.B.'s allegations against Contreras. But she had not witnessed the event and did not say that she believed

10

Contreras' account of what had happened. She recounted what Contreras had told her—that K.B. had pulled down his gym shorts and tried to put his penis in her mouth, but Contreras immediately stopped her.

The jury found Contreras guilty on all counts. At sentencing, the district court denied Contreras' departure motion and imposed a controlling life sentence without the possibility of parole for 25 years, with all other counts running concurrently. The district court also imposed a term of lifetime postrelease supervision.

Contreras timely appeals his conviction and sentence.

### DID THE DISTRICT COURT ERR IN ALLOWING A WITNESS TO INVOKE HIS FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION?

We first address Contreras' argument that the district court erred by not compelling Father's testimony at trial. The State asserts that this Fifth Amendment issue is not preserved for appellate review and that we should apply the doctrines of acquiescence or judicial estoppel to deny Contreras' claim. So we first consider whether any of these procedural barriers apply.

*Preservation*

The State argues at some length that this court is precluded from reviewing the merits of Contreras' claim because Contreras violated the contemporaneous objection rule in K.S.A. 60-404. Under that rule, "[a] party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal." *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012). The State argues that Contreras failed to object to the district court's decision to allow Father to invoke his Fifth Amendment privilege.

11

Contreras counters that deciding whether a witness may take the Fifth is not purely an evidentiary issue, and the district court did not admit evidence at trial, so the general rule requiring a contemporaneous objection does not apply. We agree. Deciding whether a witness may properly invoke the Fifth Amendment and thus not testify is different in kind than deciding whether to admit a specific question or line of questioning from a witness. K.S.A. 60-404 clearly covers the latter. But K.S.A. 60-404 does not apply here, where the issue is not solely an evidentiary one that may rest within the district court's discretion, but a question of law whether a witness has a right to assert the Fifth Amendment. See *State v. Hughes*, 286 Kan. 1010, 1029, 191 P.3d 268 (2008) (When we review an asserted violation of a Fifth Amendment privilege against self-incrimination, we review the district court's factual findings using a substantial competent evidence standard but review the ultimate legal conclusion "as a question of law using an unlimited standard of review."). And, as a practical matter, because Father did not testify, Contreras had no reason and no opportunity to object in the jury's presence when he would have examined Father.

Even if K.S.A. 60-404 would generally apply here, the purpose of the rule was met by the parties' arguments, which squarely presented the issue to the district court for its resolution. The purpose of the rule is to give "the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial." *State v. Moore*, 218 Kan. 450, 455, 543 P.2d 923 (1975). The rule is a "prudential rather than jurisdictional obstacle to appellate review." *Gaona*, 293 Kan. at 956. So, on occasion, our appellate courts have refused to strictly apply the contemporaneous objection rule when the underlying purpose for the rule has been satisfied. See, e.g., *State v. Hart*, 297 Kan. 494, 510-11, 301 P.3d 1279 (2013); *State v. Spagnola*, 295 Kan. 1098, 1103, 289 P.3d 68 (2012); *State v. Breedlove*, 295 Kan. 481, 490-91, 286 P.3d 1123 (2012). That is the case here.

12

True, Contreras never explicitly stated that he "objected" to Father's invocation of the Fifth Amendment. Still, the issue was timely raised just before Father's anticipated testimony—Contreras proffered what Father's expected testimony was, both sides argued the issue, and the district court decided it. Contreras' arguments were enough to advise the trial court of the evidence at issue and to assure an adequate record for appellate review. See *State v. Gonzalez*, 311 Kan. __, 460 P.3d 348, 364-65 (2020) (applying K.S.A. 60-405 to district court's refusal to compel witness' testimony, finding insufficient proffer of excluded evidence precludes appellate review). Contreras' argument just before Father's expected testimony was sufficient to preserve his claim of error on appeal.

The State next argues that Contreras also had to object when the district court excused Father from the trial. But because it provides no authority for that assertion, we consider this argument abandoned. See *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015) ("When a litigant fails to adequately brief an issue it is deemed abandoned."). Nor does the State offer a persuasive reason why such an objection would be required right after the district court resolved the disputed Fifth Amendment issue that necessitated Father's excusal. Contreras had fully stated the basis for his disagreement with the district court's decision not to compel Father's testimony—nothing different could be stated about the district court's excusing Father from the proceedings. See *Anderson v. Dugger*, 130 Kan. 153, 156, 285 P. 546 (1930) (finding "[t]he law does not require the performance of a futile or useless act").

*The Doctrine of Acquiescence*

The State briefly argues that Contreras acquiesced in the district court's decision by two acts: failing to object when the district court excused Father from the courtroom; and making certain statements at sentencing. We are unpersuaded.

13

Because it involves jurisdiction, whether a party acquiesced to a judgment is a question of law subject to unlimited review. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006).

Acquiescence to a judgment—which bars appellate review—occurs when a party voluntarily complies with a judgment by assuming the burdens or accepting the benefits of the judgment contested on appeal. A party who voluntarily complies with a judgment should not be permitted to pursue an inconsistent position by appealing from that judgment. *Alliance Mortgage Co.*, 281 Kan. at 1271. So, for example, a litigant who voluntarily pays a fine may be found to have acquiesced in the judgment by so doing. See *Huet-Vaughn v. Kansas State Bd. of Healing Arts*, 267 Kan. 144, 978 P.2d 896 (1999).

The State does not provide any authority to show that the doctrine of acquiescence applies in a criminal case to a district court's Fifth Amendment ruling. That ruling is not a "judgment," as that term is used in this doctrine, and the doctrine of acquiescence has "limited application in criminal cases." *State v. Kelley*, 42 Kan. App. 2d 782, 793, 217 P.3d 56 (2009) (finding that the district court's ruling on an evidentiary issue at a criminal trial is not a judgment to which the doctrine of acquiescence applies). And, as we found above, Contreras could have accomplished nothing by objecting to Father's release right after the district court determined that Father could not testify about the only questions Contreras wanted to ask him.

The State suggests that Contreras is taking a position on appeal contrary to the one he pursued at trial. Here, the State alleges that at sentencing defense counsel declined to produce Father's recorded interview, saying Father "didn't get to testify much on behalf of Mr. Contreras, and he took the Fifth, so I'm—I'm uncomfortable giving over a disk where *he might potentially be subjecting himself to criminal liability for a very serious crime* without some order from the Court." The court declined to compel production of the interview. Because Contreras asserts on appeal that Father's testimony would *not* have

14

subjected himself to possible criminal liability, the State asserts he is taking inconsistent positions.

But a fair reading of the record as a whole shows that Contreras' position on appeal is the same as he argued below—he asked the district court to compel Father to testify because his Fifth Amendment privilege against self-incrimination did not apply. He also asked Father whether he understood that his plea barred further prosecution for any sexual contact in December 2012. Contreras makes the same argument on appeal. The statements at sentencing by Contreras' counsel reflect compliance with the then recent district court ruling that Father could invoke his Fifth Amendment privilege, but they do not reflect Contreras' advocacy position either at trial or on appeal. The doctrine of acquiescence does not apply.

*The Doctrine of Judicial Estoppel*

The State also asks us to apply the doctrine of judicial estoppel. As best we understand this argument, the State argues again that Contreras is changing his position on appeal and that the district court would have taken different measures to address the issue if Contreras' argument on appeal had been presented to it.

This court has detailed the basic legal principles and purposes of applying judicial estoppel:

> "The doctrine of judicial estoppel . . . advances notions of fair play by precluding a party from inducing judicial action by taking one legal position and then taking a contrary position later to achieve further advantage over the same adverse party. The United States Supreme Court recognized that the doctrine '"generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."' A court may apply judicial estoppel in its discretion as necessary to preserve '"the essential integrity of the judicial process."'

15

[Citations omitted.]" *State v. Hargrove*, 48 Kan. App. 2d 522, 548-49, 293 P.3d 787 (2013).

The State shows no authority that counsels us to apply this doctrine here. And as we found above, Contreras has not changed his position on appeal from his position at trial. Nothing in the record suggests that Contreras' attorney tactically withheld information or took a contrary position at the district court level to try to prevail on this issue on appeal. And Contreras did not prevail in the district court. Under these circumstances, Contreras is not barred by the doctrine of judicial estoppel. Thus, we find no procedural barriers to our considering the merits of the Fifth Amendment issue.

*Standard of Review*

Contreras argues that the district court's erroneous decision that Father could invoke the Fifth Amendment privilege against self-incrimination violated his constitutional right to present a defense. The State seems to concede that the district court erred in its Fifth Amendment ruling, as it argues on appeal only the procedural bars we have rejected above, and that the error was harmless, an issue we address below.

In considering an asserted violation of a Fifth Amendment privilege against self-incrimination, we review the district court's factual findings using a substantial competent evidence standard but we review the ultimate legal conclusion as a question of law using an unlimited standard of review. *Hughes*, 286 Kan. at 1029.

*Analysis*

Exclusion of evidence which is an integral part of a defendant's theory violates the right to a fair trial.

16

"A defendant must be permitted to present a complete defense in a meaningful manner, and exclusion of evidence which is an integral part of a defendant's theory violates the right to a fair trial. However, a defendant's right to call and examine witnesses is not absolute and on occasion will be overridden by 'other legitimate interests in the criminal trial process.' [Citation omitted.]" *State v. Green*, 254 Kan. 669, 675, 867 P.2d 366 (1994).

Generally, no person has a privilege to refuse to be a witness.

"(a) [E]very person is qualified to be a witness, and (b) no person has a privilege to refuse to be a witness, and (c) no person is disqualified to testify to any matter, and (d) no person has a privilege to refuse to disclose any matter or to produce any object or writing, and (e) no person has a privilege that another shall not be a witness or shall not disclose any matter or shall not produce any object or writing, and (f) all relevant evidence is admissible." K.S.A. 60-407.

But the general rules in this statute must yield to the specific guarantee of the privilege against self-incrimination in the Fifth Amendment to the United States Constitution, § 10 of the Kansas Constitution, and K.S.A. 60-425. See *In re Investigation into Homicide of T.H.*, 23 Kan. App. 2d 471, 474, 932 P.2d 1023 (1997). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, K.S.A. 60-425 provides that "every natural person has a privilege, which he or she may claim, to refuse to disclose in an action . . . any matter that will incriminate such person." This prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973).

17

The privilege protects both a defendant and any other witness whose answers may expose him to future criminal liability. *Lefkowitz*, 414 U.S. at 77. So a witness who invokes the statutory or constitutional privilege against self-incrimination cannot be compelled to give testimony which could possibly expose him to a criminal charge. *Ullmann v. United States*, 350 U.S. 422, 431, 76 S. Ct. 497, 100 L. Ed. 511 (1956).

But the privilege itself has limitations. The privilege against self-incrimination "ends after sentence is imposed where a plea of guilty has been regularly accepted by the court, and no motion is made to withdraw it." *State v. Bailey*, 292 Kan. 449, Syl. ¶ 7, 255 P.3d 19 (2011); *State v. Longobardi*, 243 Kan. 404, Syl. ¶ 1, 756 P.2d 1098 (1988). Thus, in *Longobardi*, a witness' later testimony about the crime for which he had already been charged and pleaded guilty could not expose him to further criminal charges. And, because he had been sentenced, his testimony could not expose him to additional punishment. As a result, our Supreme Court found the district court erred by permitting that witness to invoke the Fifth Amendment. Nonetheless, because the jury had heard the same evidence from other sources, the error was harmless. 243 Kan. at 409.

Here, the district court held a hearing outside the presence of the jury to determine whether Father could be compelled to testify. Father, imprisoned at the time apparently for his crimes against K.B., had been transported to the courtroom but was not represented by counsel. Although Contreras' counsel argued that Father's prior criminal conviction terminated his privilege, the district court disagreed. It found that because Father's conviction did not include the December 2012 timeframe, Father could still be prosecuted for sex acts with K.B. in December 2012 if he testified.

Contreras argues that this decision was erroneous because the district court failed to reach the heart of the issue—it did not determine whether Father's plea agreement included a promise to dismiss Father's other charges with prejudice.

We agree that the district court's Fifth Amendment determination was made without the benefit of the essential documents that would have informed its decision. And we do not fault Contreras for that omission. Contreras supported his position that Father could testify with Father's assertion that he could not be prosecuted for the December 2012 event involving K.B. because it would be double jeopardy.

> "THE COURT: You were convicted of a crime based on a plea bargain agreement; is that correct?
>
> "[FATHER]: Yes, sir.
>
> "THE COURT: Was part of that plea bargain agreement that you would not have any criminal liability for anything else involving any crimes that you perpetrated with regard to [K.B.]?
>
> "[FATHER]: I was under the understanding that if anything happened again, it would be double jeopardy.
>
> "THE COURT: Say that again.
>
> "[FATHER]: It would be double jeopardy—
>
> "THE COURT: Okay.
>
> "[FATHER]: —is what I was informed.
>
> "THE COURT: Was part of the plea bargain agreement that whatever you entered a plea to that resulted in the conviction you wouldn't be prosecuted for any other acts with regard to [K.B.]?
>
> "[FATHER]: Yes."

Father was correct.

The State invited the confusion by giving the district court Father's journal entry of judgment which showed only the dismissal of count one. The State failed to show the district court the plea agreement, the complaint, or the journal entry of arraignment which would have completed an accurate understanding of Father's prior conviction. Understanding the scope of Father's prior proceedings is essential to determining whether his testimony here might expose him to a future criminal charge.

19

In June 2019, this court approved Contreras' motion on appeal to take judicial notice of additional documents relevant to Father's prior conviction. The State briefly asserts that the only time to take judicial notice is during a jury trial. But it makes only a conclusory statement to this effect and cites no authority to support it. Thus, we do not consider this objection. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019). And the authority we know of is to the contrary. See *State v. Wolfe*, 194 Kan. 697, 698, 401 P.2d 917 (1965) ("This court is authorized under K.S.A. 60-412[c] to take judicial notice of any matter specified in K.S.A. 60-409, whether or not judicially noticed by the court below.").

The three documents we have judicially noticed on appeal are all from Father's Clark County case 13 CR 25: the complaint, a journal entry of arraignment, and the same journal entry of judgment that the district court reviewed. The two documents provided to us, yet not shared with the district court, support Contreras' claim that at the time of trial Father did not have a privilege against self-incrimination for the December 2012 incident with K.B.

The complaint shows that Father was charged with two counts of aggravated criminal sodomy:

- The first count charged Father with aggravated criminal sodomy of a child between April 29, 2011, and March 5, 2012;
- The second count charged Father with aggravated criminal sodomy of a child between March 5, 2012, and January 10, 2013.

The journal entry of arraignment shows that in exchange for Father's plea of no contest to count one, the State agreed to dismiss count two. Count two included the timeframe in which the December 2012 incident between K.B. and Father occurred—the incident Contreras wanted Father to testify about. It further shows that the court ordered

that count two of the complaint be dismissed "with prejudice." The State presented the district court with only the journal entry of judgment, which reflects disposition of count one but does not mention a second count or its dismissal. The district court did not have the benefit of the complaint or the journal entry of arraignment which conclusively shows that count two was dismissed with prejudice.

But the effect of that dismissal must be clear if Father is to rely on it. Did the dismissal with prejudice in 2013 insulate Father only from future charges of sodomy with K.B. between March 5, 2012, and January 10, 2013, or did that dismissal more broadly insulate him from being charged with any criminal conduct with K.B. between the dates in the dismissed count?

A dismissal with prejudice is res judicata and "bars a later lawsuit on the same transaction or occurrence." *Honeycutt v. City of Wichita*, 251 Kan. 451, 458, 836 P.2d 1128 (1992).

> "It has been ruled that, under our Code, two methods of dismissal are provided; one is dismissal without prejudice, and another is dismissal with prejudice to a further action. A dismissal with prejudice has been held to be an adjudication on the merits of the case, a final disposition of the controversy which bars the right to bring or maintain an action on the same claim or cause of action. *Hargis v. Robinson*, 70 Kan. 589, 79 P. 119 [1905], and cases there cited. See, also, *Robinson v. Railway Co.*, 96 Kan. 137, 150 P. 636 [1915]; *Davis v. Davis*, 101 Kan. 395, 166 P. 515 [1917]; *U.S. v. Parker*, 120 U.S. 89, 7 S. Ct. 454, 30 L. Ed. 601 [1887]." *Pulley v. Chicago, R.I. & P. Ry. Co.*, 122 Kan. 269, 270-71, 251 P. 1100 (1927).

Black's Law Dictionary defines the phrase "with prejudice" as "[w]ith loss of all rights; in a way that finally disposes of a party's claim and bars any future action on that claim." (Emphasis added.) Black's Law Dictionary 1919 (11th ed. 2019). Black's Law Dictionary defines "dismissal with prejudice" as "[a] dismissal, usu. after an adjudication

on the merits, barring the plaintiff from prosecuting any later lawsuit on the same claim. If, after a dismissal with prejudice, the plaintiff files a later suit on the same claim, the defendant in the later suit can assert the defense of res judicata (claim preclusion)." Black's Law Dictionary 590 (11th ed. 2019).

"To be clear, 'dismissal with prejudice means that [Plaintiffs] may not seek to reinstate this action' or bring any claims against these Defendants arising out of this set of facts before any court." *Heine v. Township of Montclair*, No. 17-12529ESJAD, 2019 WL 316167, at *5 (D.N.J. 2019) (unpublished opinion). This principle is reflected in the criminal context in *State v. Hendrix*, 174 So. 3d 978 (Ala. Crim. App. 2015). There, the State dismissed with prejudice a vehicular homicide indictment because of the defendant's mental disease or defect. Six years later, the State filed a second indictment based on the same facts, but alleging different legal theories, including reckless manslaughter. The question was whether the dismissal with prejudice precluded only the refiling of a vehicular homicide case, or whether it also precluded refiling any case based on the same set of operative facts. The court found, "when a trial court orders that an indictment is to be dismissed 'with prejudice,' it ultimately disposes of that case and ordinarily prevents subsequent indictments of the defendant based on the same set of operative facts underlying the dismissed indictment." 174 So. 3d at 981.

We believe that statement of law is correct. Otherwise, the State could dismiss a case with prejudice, then refile it merely asserting different legal theories, misleading the defendant into making a plea and rendering the defendant's benefit under the plea agreement illusory. See *CIT Grp./Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d 676, 678-79, 32 P.3d 1197 (2001) ("a contract which purports to promise a specified performance but allows one party the discretion to determine whether to perform is only an illusory contract and unenforceable"). A dismissal with prejudice thus operates as to past crimes as transactional immunity from prosecution does as to future crimes. See K.S.A. 2019 Supp. 22-3415(b)(1) ("Any person granted transactional

22

immunity shall not be prosecuted for any crime which has been committed for which such immunity is granted *or for any other transactions arising out of the same incident*." [Emphasis added.]). So when a court dismisses a count "with prejudice," that dismissal prevents later charges against the same defendant based on the same set of operative facts underlying the dismissed count.

As applied here, the dismissal with prejudice prevents Father's later charge based on the same set of facts underlying count two, which was dismissed with prejudice in 2013. Thus, he cannot be charged with any criminal conduct with K.B. that may have occurred between March 5, 2012, and January 10, 2013, based on the same set of operative facts. Because the State could not have prosecuted Father for the December 2012 event, Father could not have incriminated himself by testifying about that event here. See *In re A.J.*, No. A140927, 2015 WL 401303, at *2 (Cal. Ct. App. 2015) (unpublished opinion) (where defendant pleaded to one count and the State dismissed the other, "appellant cannot be prosecuted for [the dismissed] crime because the failure to prosecute counts transactionally related to the charge of [conviction] precludes further prosecution for any such crimes"). There is no basis for assertion of the privilege against self-incrimination "where there can be no further incrimination." *Mitchell v. United States*, 526 U.S. 314, 326, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999).

The Fifth Amendment operates only where a witness is asked to incriminate himself or herself; that is, to give testimony which could possibly expose the witness to a criminal charge. *Ullmann*, 350 U.S. at 431. There was no jeopardy to Father in being compelled to testify about conduct for which he could never be charged. Because the dismissal of count two prevented the State from charging Father again with a crime arising from the same events that supported the dismissed charge, Father could not be prosecuted for the December 2012 incident. Thus, he could not invoke a privilege against self-incrimination for that incident and should have been compelled to testify. See 350

23

U.S. at 431 ("if the criminality has already been taken away, the amendment ceases to apply").

Because Father did not have a privilege against self-incrimination, the district court erred in failing to compel his testimony. The State could then have tried to impeach Father with his prior convictions.

*Harmless Error*

The State contends that the district court's error was harmless. We agree that the constitutional right to compel a witness to testify is subject to a harmless error analysis.

> "[U]nder the United States Constitution and the Kansas Constitution, a defendant has the right to compel a witness to appear and testify. However, the constitutional right of an accused to compel a witness to testify is not absolute. Errors which do not affirmatively appear to have prejudicially affected the substantial right of a defendant do not require reversal when substantial justice has been done. In determining that a federal constitutional error constitutes harmless error, a court must be able to declare the error had little, if any, likelihood of having changed the result of the trial, and the court must be able to declare such beyond a reasonable doubt. *State v. Peltier,* 249 Kan. 415, Syl. ¶ 5, 819 P.2d 628 (1991)." *State v. Green*, 254 Kan. 669, 680, 867 P.2d 366 (1994).

When an error infringes on a party's federal constitutional right, a court will declare a constitutional error harmless only when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]).

We consider several factors in reviewing the erroneous exclusion of evidence, including: "'the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the case.'" *State v. Burnett*, 300 Kan. 419, 434-35, 329 P.3d 1169 (2014). This analysis assists our determination here.

Contreras maintains that Father's testimony was central to his case because his trial was a "credibility contest," and Father's testimony that he also received unsolicited oral sex from K.B. was the sole evidence that could have corroborated his version of events. At trial, Contreras' testimony and theory was that he did not assault K.B. and he did not provoke any sexual activity— their sole sexual encounter was when K.B. initiated oral sex and Contreras quickly rebuffed it.

The district court found that Father's expected testimony was material, relevant, and admissible:

> "That material fact would be whether [K.B.] commenced performance of oral sex spontaneously without encouragement, without defendant realizing what was occurring. The evidence that she did so before would tend to prove that material fact in issue, and I would find that that is therefore relevant and admissible."

Thus, the sole reason the district court did not admit Father's testimony at trial was because it erroneously found Father had a valid Fifth Amendment privilege.

The State argues that Father's testimony would have been irrelevant. It asserts that because Contreras testified that K.B.'s mouth never touched his penis, Father's account of waking up to unsolicited oral sex from K.B. was irrelevant. But the jury also heard contrary evidence that K.B.'s mouth did touch Contreras' penis. And Father's testimony

25

would have shown that K.B. manipulated his clothing—as Contreras also claimed—to perform a sexual act. Father's testimony is relevant, as the district court found above.

The State also asserts that Father's testimony would have been cumulative because the jury heard from other sources that Father had given K.B. the idea to perform oral sex—he told her that when people do good things for you, you should reward them in that way. But where K.B. got the idea to act in such a manner is not the same material fact Father was called to testify about—Father was expected to testify that K.B. tried to perform oral sex on him spontaneously and without encouragement. Unlike in *Longobardi*, 243 Kan. at 409, where our Supreme Court found a Fifth Amendment error harmless because the same testimony the defendant sought to compel was given by other witnesses, no other witness testified to the primary facts Father would have testified about. Thus, we do not agree that Father's testimony would have been cumulative. See *State v. James*, 309 Kan. 1280, 1305, 443 P.3d 1063 (2019) (finding abuse of discretion is the standard of review when a party challenges evidence as cumulative).

This case distilled to a credibility battle between Contreras and K.B. Contreras was the only person who testified on his behalf. Although Mother testified that she did not believe K.B.'s allegations against Contreras, she did not state that she believed Contreras' account of events either. Instead, she simply recounted what Contreras had told her. Father's testimony that K.B. had initiated oral sex with him was evidence that could have given credence to Contreras' account that K.B. had done the same with him. And it was the only evidence that could do so. Father's testimony was crucial to support Contreras' claim.

Not surprisingly, the State does not contend that overwhelming evidence supports Contreras' convictions. Although Popejoy collected two pairs of shorts from Contreras' home, the State presented no physical evidence of sexual abuse. The strength of the State's case rested on K.B.'s credibility. Yet evidence was presented that K.B. struggled

26

with memory problems. She recanted her allegations about Contreras, then withdrew her recantation. Her accusations against Contreras of what events occurred and where they occurred changed over time, significantly broadening after she began therapy with Athy. Her trial testimony of events, although later in time, differed from her earlier statements to Athy and others. Her own mother told detectives and the jury that she did not believe K.B.'s accusations against Contreras. And because the State did not charge Contreras until several years after the events, all witnesses were asked to recall events that had occurred five years or more before trial. The overall strength of the State's case is less than overwhelming.

We do not mean to suggest that Contreras would win a credibility contest. But we cannot say, beyond a reasonable doubt, that the error in not compelling Father's testimony did not affect the outcome of the trial in light of the entire record. Therefore, the error in permitting Father to invoke the Fifth Amendment privilege was not harmless.

*Effect on counts other than aggravated sodomy*

Lastly, the State argues that any error affected only Contreras' convictions for aggravated sodomy, so his convictions for two counts of rape and aggravated intimidation of a victim should stand. But this argument ignores the fact that Contreras denied all charges against him and that Father's testimony would have given credence to that denial. It is conceivable that had Father testified, the jury may have believed Contreras' general denial of all events. It is also conceivable that even if the jury found that K.B. put her mouth on Contreras' penis, it may have convicted him of a single count of aggravated criminal sodomy. See K.S.A. 2019 Supp. 21-5501(b); K.S.A. 2019 Supp. 21-5504(b)(1). K.B.'s credibility was an issue not only as to the sex abuse charges, but also as to the charge of aggravated intimidation of a victim. Under these circumstances, the State fails to convince us that there is no reasonable possibility that the error affected the jury's verdict on all counts.

27

Because the State fails to show that the erroneous exclusion of Father's testimony was harmless, we reverse all of Contreras' convictions and remand for a new trial.

We find it unnecessary to address the other issues briefed on appeal.

Reversed and remanded.